# The Grose Law Firm, LLC

**404 Main Street, Greenwood, South Carolina 29646**

E. Charles Grose, Jr.
Phone: 864-538-4466 Fax: 864-538-4405
E-mail: charles@groselawfirm.com
Web: GroseLawFirm.com

April 6, 2020

The Honorable Charles L. Reel
Clerk of Court, Edgefield County
P.O. Box 34
Edgefield, SC 29824

     Re:   *K.C. Langford v. State of South Carolina*
           Case Number 2020-CP-19-_____

Dear Mr. Reel:

    Enclosed for filing, please find Mr. Langford's application for post-conviction relief. Because this action seeks post-conviction relief, I understand there is not a filing fee and electronic filing is not applicable.

    I also understand your office will forward a copy of this application to the Attorney General's Office pursuant to S.C. Code Ann. § 17-27-40; however, by copy of this letter to the post-conviction relief section, I am providing the Attorney General's Office with a curtsey copy.

    Thank you for your attention to this matter. Please let me know if you have any questions or require additional information.

    With kindest regards, I am

             Yours very truly,

             E. Charles Grose, Jr.

cc:    Mr. K.C. Langford (via US Mail)
       Melody J. Brown, Esquire (via email)
       Megan Harrigan Jameson, Esquire (vial email)

**STATE OF SOUTH CAROLINA**                    )          **IN THE COURT OF COMMON PLEAS**
                                               )
**COUNTY OF** Edgefield                         )
                                               )
K.C. Langford, SCDC# 294500,                   )          **CIVIL ACTION COVERSHEET**
                                  **Plaintiff(s)** )
                                               )          2020-**CP** - 19- _____
                                               )
                      **vs.**                   )
                                               )
State of South Carolina                        )
                                 **Defendant(s)** )

| | |
|---|---|
| **Submitted By:** Charles Grose | **SC Bar #:** 66063 |
| **Address:** 404 Main Street, Greenwood, SC 20646 | **Telephone #:** 864-538-4466 |
| | **Fax #:** 864-538-4405 |
| | **Other:** |
| | **E-mail:** charles@groselawfirm.com |

NOTE: The coversheet and information contained herein neither replaces nor supplements the filing and service of pleadings or other papers as required by law. This form is required for the use of the Clerk of Court for the purpose of docketing cases that are NOT E-Filed. It must be filled out completely, signed, and dated. A copy of this coversheet must be served on the defendant(s) along with the Summons and Complaint. **This form is NOT required to be filed in E-Filed Cases.**

## DOCKETING INFORMATION  *(Check all that apply)*
***If Action is Judgment/Settlement do not complete**

☐ **JURY TRIAL** demanded in complaint.          ☒ **NON-JURY TRIAL** demanded in complaint.
☐ This case is subject to **ARBITRATION** pursuant to the Court Annexed Alternative Dispute Resolution Rules.
☐ This case is subject to **MEDIATION** pursuant to the Court Annexed Alternative Dispute Resolution Rules.
☒ This case is exempt from ADR. (Proof of ADR/Exemption Attached)

## NATURE OF ACTION  *(Check One Box Below)*

| Contracts | Torts - Professional Malpractice | Torts – Personal Injury | Real Property |
|---|---|---|---|
| ☐ Constructions (100) | ☐ Dental Malpractice (200) | ☐ Conversion (310) | ☐ Claim & Delivery (400) |
| ☐ Debt Collection (110) | ☐ Legal Malpractice (210) | ☐ Motor Vehicle Accident (320) | ☐ Condemnation (410) |
| ☐ General (130) | ☐ Medical Malpractice (220) | ☐ Premises Liability (330) | ☐ Foreclosure (420) |
| ☐ Breach of Contract (140) | Previous Notice of Intent Case # | ☐ Products Liability (340) | ☐ Mechanic's Lien (430) |
| ☐ Fraud/Bad Faith (150) | 20____-NI-____-____ | ☐ Personal Injury (350) | ☐ Partition (440) |
| ☐ Failure to Deliver/ | ☐ Notice/ File Med Mal (230) | ☐ Wrongful Death (360) | ☐ Possession (450) |
| Warranty (160) | ☐ Other (299) _____ | ☐ Assault/Battery (370) | ☐ Building Code Violation (460) |
| ☐ Employment Discrim (170) | | ☐ Slander/Libel (380) | ☐ Other (499) _____ |
| ☐ Employment (180) | | ☐ Other (399) _____ | |
| ☐ Other (199) _____ | | | |

| Inmate Petitions | Administrative Law/Relief | Judgments/Settlements | Appeals |
|---|---|---|---|
| ☒ PCR (500) | ☐ Reinstate Drv. License (800) | ☐ Death Settlement (700) | ☐ Arbitration (900) |
| ☐ Mandamus (520) | ☐ Judicial Review (810) | ☐ Foreign Judgment (710) | ☐ Magistrate-Civil (910) |
| ☐ Habeas Corpus (530) | ☐ Relief (820) | ☐ Magistrate's Judgment (720) | ☐ Magistrate-Criminal (920) |
| ☐ Other (599) | ☐ Permanent Injunction (830) | ☐ Minor Settlement (730) | ☐ Municipal (930) |
| _____ | ☐ Forfeiture-Petition (840) | ☐ Transcript Judgment (740) | ☐ Probate Court (940) |
| | ☐ Forfeiture—Consent Order (850) | ☐ Lis Pendens (750) | ☐ SCDOT (950) |
| | ☐ Other (899) | ☐ Transfer of Structured | ☐ Worker's Comp (960) |
| | _____ | Settlement Payment Rights | ☐ Zoning Board (970) |
| | | Application (760) | ☐ Public Service Comm. (990) |
| | | ☐ Confession of Judgment (770) | ☐ Employment Security Comm (991) |

| Special/Complex /Other | | Judgments/Settlements | Appeals |
|---|---|---|---|
| ☐ Environmental (600) | ☐ Pharmaceuticals (630) | ☐ Petition for Workers | ☐ Other (999) |
| ☐ Automobile Arb. (610) | ☐ Unfair Trade Practices (640) | Compensation Settlement | _____ |
| ☐ Medical (620) | ☐ Out-of-State Depositions (650) | Approval (780) | |
| ☐ Other (699) _____ | ☐ Motion to Quash Subpoena in | ☐ Incapacitated Adult Settlement | |
| ☐ Sexual Predator (510) | an Out-of-County Action (660) | (790) | |
| ☐ Permanent Restraining Order (680) | ☐ Pre-Suit Discovery (670) | ☐ Other (799) _____ | |
| ☐ Interpleader (690) | | | |

**Submitting Party Signature:** _[signature]_          **Date:** April 6, 2020

**Note:** Frivolous civil proceedings may be subject to sanctions pursuant to SCRCP, Rule 11, and the South Carolina Frivolous Civil Proceedings Sanctions Act, S.C. Code Ann. §15-36-10 et. seq.

**Effective January 1, 2016,** Alternative Dispute Resolution (ADR) is mandatory in all counties, pursuant to Supreme Court Order dated November 12, 2015.

SUPREME COURT RULES REQUIRE THE SUBMISSION OF ALL CIVIL CASES TO AN ALTERNATIVE DISPUTE RESOLUTION PROCESS, UNLESS OTHERWISE EXEMPT.

**Pursuant to the ADR Rules, you are required to take the following action(s):**

1. The parties shall select a neutral and file a "Proof of ADR" form on or by the 210th day of the filing of this action. If the parties have not selected a neutral within 210 days, the Clerk of Court shall then appoint a primary and secondary mediator from the current roster on a rotating basis from among those mediators agreeing to accept cases in the county in which the action has been filed.

2. The initial ADR conference must be held within 300 days after the filing of the action.

3. Pre-suit medical malpractice mediations required by S.C. Code §15-79-125 shall be held not later than 120 days after all defendants are served with the "Notice of Intent to File Suit" or as the court directs.

4. Cases are exempt from ADR only upon the following grounds:

    a. Special proceeding, or actions seeking extraordinary relief such as mandamus, habeas corpus, or prohibition;

    b. Requests for temporary relief;

    c. Appeals

    d. Post Conviction relief matters;

    e. Contempt of Court proceedings;

    f. Forfeiture proceedings brought by governmental entities;

    g. Mortgage foreclosures; and

    h. Cases that have been previously subjected to an ADR conference, unless otherwise required by Rule 3 or by statute.

5. In cases not subject to ADR, the Chief Judge for Administrative Purposes, upon the motion of the court or of any party, may order a case to mediation.

6. Motion of a party to be exempt from payment of neutral fees due to indigency should be filed with the Court within ten (10) days after the ADR conference has been concluded.

**Please Note:**     **You must comply with the Supreme Court Rules regarding ADR.**
                   **Failure to do so may affect your case or may result in sanctions.**

SCCA / 234 (02/2018)                                                    Page 2 of 2

THE STATE OF SOUTH CAROLINA          )     IN THE COURT OF COMMON PLEAS
                                     )     FOR THE ELEVENTH JUDICIAL CIRCUIT
COUNTY OF EDGEFIELD                   )
                                     )        Case No. 2020-CP-19-_____
K.C. Langford, SCDC# 294500,          )
                          Applicant,  )
                                     )     **Application for Post-Conviction Relief**
              vs.                     )
                                     )
                                     )
State of South Carolina,              )
                         Respondent.  )
_____       )

Pursuant to the Uniform Post-Conviction Relief Act, S.C. Code Ann. § 17-27-10 *et. seq.*,

K.C. Langford submits this application for post-conviction relief.[1]

1)     Mr. Langford is confined at the Evans Correctional Institution.

2)     The Honorable William P. Keesley, Presiding Judge for Edgefield County,

imposed the sentences.

3)     The co-defendants were Bryan Phillips and Alvin Phillips.

4)     On September 9, 2010, Judge Keesley imposed concurrent sentences of five years

for criminal conspiracy (2008-GS-19-00673), twenty years for first-degree burglary (2010-GS-

19-00272), twenty years for armed robbery (2010-GS-19-00273), and twenty years for

kidnapping (2010-GS-19-00278).

5)     Please see number 4 above for the date and terms of the sentences.

6)     The sentences were imposed after a plea of not guilty and trial by jury.

_____

[1] This pleading is based on Form 5, Revised 3/2003, which can be found on the South
Carolina Judicial Department website.  Mr. Langford reserves the right to amend this pleading is
provided by law.  Rule 71.1(d), SCRCP; S.C. Code Ann. § 17-27-90 (expressly contemplating
supplemental or amended PCR application); *Mangal v. State*, 421 S.C. 85, 99, 805 S.E.2d 568,
575 (2017) ("[T]he interests of justice require PCR courts to be flexible with procedural
requirements *before* PCR applicants suffer procedural default on substantial claims."); *Love v.
State*, 428 S.C. 231, 834 S.E.2d 196 (2019) (denial of motion to amend application for post-
conviction relief was abuse of discretion).

1

7)     Mr. Langford appealed his convictions and sentences.

8)     Mr. Langford appealed to the South Carolina Court of Appeals. Pursuant to Rule 204(b), SCACR, the Supreme Court of South Carolina certified the case. On November 21, 2012, the Supreme Court affirmed the convictions and sentences. *State v. Langford*, 400 S.C. 421, 735 S.E.2d 471 (2012). The Supreme Court of the United States denied Mr. Langford's petition for a writ of *certiorari* on October 7, 2013. *Langford v. South Carolina*, 571 U.S. 831 (2013).

9)     Not applicable because Mr. Langford appealed.

10)    Grounds for Relief:

a)     Mr. Langford was denied his right to the effective assistance of counsel, as guaranteed by the Sixth and Fourteenth Amendments to the United States Constitution and Article I, §§ 3 and 14 of the South Carolina Constitution. *Strickland v. Washington*, 466 U.S. 668 (1984); *Smalls v. State*, 422 S.C. 174, 810 S.E.2d 836 (2018).

b)     Mr. Langford was denied the right to effective assistance of appellate counsel, guaranteed by the Sixth and Fourteenth Amendments to the United States Constitution and by Article I, §§ 3 and 14 of the South Carolina Constitution. *Evitts v. Lucey*, 469 U.S. 387, 396 (1985); *Smith v. Robbins*, 528 U.S. 259 (2000); *Southerland v. State*, 337 S.C. 610, 524 S.E.2d 833 (1999); *Patrick v. State*, 349 S.C. 203, 562 S.E.2d 609 (2002).

11)    Supporting Facts:

a)     Trial counsel's performance was deficient and prejudicial for the following reasons:

(i)     Trial counsel rendered deficient and prejudicial assistance of counsel by failing to obtain a certified Chinese interpreter.

(ii)     Trial counsel rendered deficient and prejudicial assistance of counsel by failing to object to the testimony of Investigator Roosevelt Young, including testimony that constituted hearsay and violated the Confrontation Clause.

b)     Appellate counsel's performance was deficient and prejudicial for the following reasons:

(i)     Appellate counsel during the appeal of Mr. Langford's prior post-conviction relief case had a conflict of interest because of her representation of co-defendant Bryan Phillips during the direct appeal of his convictions and sentences. *State v. Phillips*, No. 2010-173307, 2012 WL 10907975 (S.C. Nov. 21, 2012). Counsel also had a conflict of interest because Mr. Langford's application for post-conviction relief alleged ineffective assistance of appellate counsel during the direct appeal of his convictions and sentences, when direct appeal counsel and post-conviction appellate counsel both worked for the South Carolina Commission on Indigent Defense, Appellate Division, during their respective representations of Mr. Langford. *See* The Spangenburg Group, *South Carolina Commission on Indigent Defense: Appellate Division Review, Final Report,* February 14, 2008, pp. 35-36, 47, a copy of which is attached as Exhibit A.

(ii)     Appellate counsel during the appeal of his prior post-conviction relief case abandoned issues that ultimately resulted in relief for co-defendant Bryan Phillips. *Bryan Phillips v. State*, Case No. 2013-CP-19-00386. The State did not appeal the grant of relief in Mr. Phillips' case. *See* Order of the Honorable J. Cordell Maddox dated May 25, 2018, a copy of which is attached as Exhibit B.

12)     Prior to filing this application, Mr. Langford filed a petition for post-conviction relief in the Court of Common Pleas for Edgefield County. *Langford v. State,* Case No. 2014-

3

CP-19-00002.  By written order dated June 15, 2017, the Honorable Eugene C. Griffith, Jr,

dismissed this application.  On October 8, 2019, the Supreme Court of South Carolina denied

Mr. Langford's petition for writ of *certiorari*.  *Langford v. State,* Appellate Case No. 2017-

001397.  The Remittitur issued on October 23, 2019.

Contemporaneously with filing this petition, Mr. Langford is filing a petition for writ of

*habeas corpus* in the United States District Court for the District of South Carolina.

13)    Please see the response to number twelve above or the nature of prior petitions,

name and locations of courts, dispositions, dates of dispositions, and citations.

14)    The grounds set forth in paragraphs 10(a) and 11(a) were included in Mr.

Langford's prior application for post-conviction relief and addressed in the order of dismissal.

Appellate counsel for Mr. Langford abandoned these two issues on appeal.  This Court can

consider these issues because of the conflict of interest of appellate counsel during the appeal of

the prior post-conviction relief case.  *Carter v. State*, 293 S.C. 528, 530, 362 S.E.2d 20, 21

(1987) ("Absent a showing that the applicant was specifically advised of the hazards of being

represented by trial counsel at the post-conviction hearing and that the applicant consented to

such an arrangement, a successive post-conviction application, alleging ineffective assistance of

trial counsel, should not be barred.").

15)    Please see number 14 above for the grounds that have been previously presented

and the proceedings in which each ground was raised.

16)    The grounds presented in paragraphs 10(b) and 11(b) have not been presented to

this or any other state court because Mr. Langford did not realize his appellate counsel had a

conflict of interest until after the Supreme Court denied his petition for writ of *certiorari*.  This

Court can consider these issues because of the conflict of interest of appellate counsel during the

appeal of the prior post-conviction relief case. *Carter, supra.*

17)    Prior Counsel:

a)    Mark R. Calhoun represented Mr. Langford during his jury trial.

b)    Elizabeth A. Franklin-Best, Elizabeth Franklin-Best, P.C., 2725 Devine Street, Columbia, SC 29205, and Breen Stevens, First Circuit Public Defender Orangeburg County Courthouse, PO Box 1112, Orangeburg, SC 29116-1112, represent Mr. Langford during his direct appeal to the Supreme Court of South Carolina.

c)    Ms. Franklin-Best represented Mr. Langford on appeal to the Supreme Court of the United States.

d)    Charles T. Brooks, III, Law Office of Charles T. Brooks, III, 309 Broad St., Sumter, SC 29150, represented Mr. Langford at the evidentiary hearing in the prior post-conviction relief case.

e)    LaNelle Cantey DuRant, 1668 Lamar Cantey Drive, Manning, SC 29102, formally of the Appellate Division of the South Carolina Commission on Indigent Defense, represented Mr. Langford during the appeal of his prior post-conviction relief case.

18)    Please see response to number 17 above for names and contact information for Mr. Langford's prior attorneys.

19)    This Court should order a new trial.  In the alternative, this Court should allow Mr. Langford to appeal the issues abandoned by appellate counsel during the appeal of his prior post-conviction relief case.

20)    Mr. Langford is not under sentence of any other court that he has not challenged.

THE STATE OF SOUTH CAROLINA      )      IN THE COURT OF COMMON PLEAS
                                 )         FOR THE  ** JUDICIAL CIRCUIT
COUNTY OF                        )
                                 )         Case No. 2020-CP-19-_____
K.C. Langford, SCDC# 294500,     )
                      Applicant, )
                                 )       **Application for Post-Conviction Relief**
              vs.                )
                                 )
                                 )
State of South Carolina,         )
                     Respondent. )
_____  )

## VERIFICATION

I, K.C. Langford, being duly sworn upon my oath, depose and say that I have subscribed

to the foregoing application; that I know the contents thereof; that it includes every ground

known to me for vacating, setting aside or correcting the conviction and sentence attacked in this

application; and that the matters and allegations therein set forth are true.


                            _____KC Langford_____
                            K.C. Langford

Sworn to and subscribed before me

this _1st_ day of _April_____, 2020

_____
NOTARY PUBLIC FOR SOUTH CAROLINA

My Commission Expires: ____2/17/24____

6

Respectfully Submitted,

By _____

E. Charles Grose, Jr.
S.C. Bar Number 66063
The Grose Law Firm, LLC
404 Main Street
Greenwood, SC 29646
(864) 538-4466
(864) 538-4405 (fax)
Email: charles@groselawfirm.com

*Attorney for K.C. Langford*

# Exhibit A

# THE SPANGENBERG GROUP

1001 Watertown Street
West Newton, MA 02465
Tel: 617.969.3820
Fax: 617.965.3966
www.spangenberggroup.com

**South Carolina Commission on Indigent Defense:
Appellate Division Review**

*FINAL REPORT*

*February 14, 2008*

Robert L. Spangenberg
President

Jennifer W. Riggs
Senior Associate

Rebecca A. Jacobstein
Senior Associate

David J. Newhouse
MIS Analyst

Merritt A. Dattel
Research Associate

Rebecca A. Desilets
Research Assistant

Sarah E. Mann
Office Administrator

Marianne Y. Hicks
Bookkeeper

Ross M. Shepard
Consultant

Michael R. Schneider
Of Counsel

Prepared for:
   SC Commission on Indigent Defense

Prepared by:
   Jennifer W. Riggs
   Merritt A. Dattel
   David J. Newhouse
   Rebecca A. Jacobstein
   Robert L. Spangenberg

# TABLE OF CONTENTS

**Introduction** ................................................................................................................ 4
   The Spangenberg Group ........................................................................................... 4
   Methodology ............................................................................................................ 5
**Chapter 1: The Appellate Division** ........................................................................ 6
   History ...................................................................................................................... 6
   Case Procedure and Assignments ............................................................................ 6
   Staffing .................................................................................................................... 8
   Standards, Policies and Procedure ......................................................................... 10
   Training and Supervision ....................................................................................... 11
   Administrative Oversight and Office Cohesiveness .............................................. 12
   Salaries ................................................................................................................... 13
   Office Space and Resources ................................................................................... 14
   Case Management System ...................................................................................... 14
   Caseload/Workload ............................................................................................... 15
      *Caseload/Workload Standards* ....................................................................... 15
      *Case Appointments* ......................................................................................... 16
      *Open Cases* ..................................................................................................... 17
      *Case Dispositions* ........................................................................................... 18
      *Briefs Filed* ..................................................................................................... 19
      *Delays Filing Briefs* ........................................................................................ 20
      *Attempts to Address Caseload* ....................................................................... 22
   Attorney Performance ............................................................................................ 24
      *Client Contact/Correspondence* ..................................................................... 24
      *Continuances* .................................................................................................. 25
      *Briefs* .............................................................................................................. 27
      *No-Merit Briefs* .............................................................................................. 27
      *Addressing Performance Problems* ................................................................ 30
   Role of Appellate Division in the South Carolina Criminal Justice System........... 31
**Chapter 2: Systemic Issues** .................................................................................... 32
   Appeals of Guilty Pleas........................................................................................... 32
      *North Carolina* ................................................................................................ 32
      *Oklahoma* ....................................................................................................... 33
      *Maryland* ........................................................................................................ 33
      *Kentucky* ......................................................................................................... 33
      *Georgia*............................................................................................................ 33
   Delays in the Appellate Process in South Carolina................................................. 34
      *Notification of Appeal* .................................................................................... 34
      *Indigency Determinations* ............................................................................... 34
      *Incomplete Transcripts* ................................................................................... 34
      *Conflicts of Interest* ........................................................................................ 35
   Post-Conviction Relief Claims................................................................................ 36
   South Carolina Rules of Professional Conduct Rule 1.10(e) .................................. 37

**Chapter 3: Findings and Recommendations** ........................................................ 39
   Appellate Division Office ..................................................................................... 39
      *Case Management System* ................................................................................ 41
      *Caseload/Workload* ......................................................................................... 41
      *Appellate Practice/Attorney Performance* ..................................................... 42
   Systemic Issues ..................................................................................................... 44
      *Appeals of Facially Valid Guilty Pleas* .......................................................... 44
      *Delays in the Appellate Process* ..................................................................... 44
      *Conflict Representation* ................................................................................... 47
      *Post-Conviction Relief* ..................................................................................... 47
**Chapter 4: Conclusion** ........................................................................................... 48

## Introduction

In the fall of 2007, The Spangenberg Group contracted with the South Carolina Commission on Indigent Defense (SCCID) to complete an independent evaluation of the Appellate Division program. In response to some concerns expressed by SCCID regarding the workload of the SCCID Appellate Division, TSG initially visited the appellate office in June 2007. At that time, TSG met with appellate attorneys and staff and began to get a sense of the challenges facing the appellate program. TSG also reviewed existing appellate data and identified a number of program concerns. However, the initial visit was not an extensive one; therefore, TSG later contracted with SCCID to perform more fully a study of the Appellate Division.

This report documents the full study of the Appellate Division, assessing the overall management of the office, the policies and procedures of the office, the general quality and efficiency of the appellate defender services being provided, and the appellate system within which the appellate defenders must operate. The overriding goal of this study is to assist the SCCID Appellate Division in effectively managing its personnel and fiscal resources as well as in ensuring that its attorneys are able to provide their clients with adequate and effective assistance of counsel.

### The Spangenberg Group

The Spangenberg Group (TSG) is a nationally recognized research and consulting firm that specializes in the improvement of indigent defense systems. TSG clients include federal, state and local governments, courts, the American Bar Association, state and local bar associations, public defender offices, law firms, foundations and other private sources. TSG has provided technical assistance and consulting services in every state in the country.

TSG is also very familiar with indigent defense systems in South Carolina, having performed work in the state since the mid-1980s. In 1985 and 1986, TSG performed research and provided technical assistance to the South Carolina State Bar regarding the compensation of court-appointed counsel. In 1988, TSG again worked for the state bar regarding the possible creation of a circuit public defender program in South Carolina. That same year, we prepared a report with recommendations regarding the state's indigent defense system for the South Carolina Blue Ribbon Task Force. In addition, in 1987 TSG conducted a study of the Richland County Public Defender Program for the program's Board of Directors.

More recently, for the past several years, TSG has been performing research and providing technical assistance to SCCID and reviewing information on the status of indigent defense statewide. This assistance has included extensive work regarding statewide data collection and reporting, such as facilitating the coordination of SCCID's data with the statewide case management system, making recommendations and assisting in establishing a case management system or systems that will be used by each of the public defender offices by the end of the year, and revising the system of data collection and evaluation in the administrative office overseeing the public defender offices.

Currently, in addition to this review of the Appellate Division, TSG continues to provide ongoing technical assistance to SCCID regarding implementation of the new statewide system and regarding the state's data and case management systems.

**Methodology**

TSG visited the Appellate Division in June and October 2007 to conduct site work for this project. TSG team members conducting site work included: Robert Spangenberg, President; Jennifer Riggs, Senior Associate; David Newhouse, MIS Analyst; Merritt Dattel, Research Associate; and Ben Keehn, consultant and long-time public defender having extensive knowledge of both trial and appellate criminal defense. During the site visits, we interviewed the Appellate Division Chief Attorney, all staff attorneys, all support staff, counsel and clerks of the South Carolina Supreme Court and the Court of Appeals, Supreme Court Disciplinary Counsel, the Chief Justice of the Supreme Court and another associate Justice, SCCID's Executive Director and another Commission member, SCCID's General Counsel, and two county public defenders, one of which recently became a circuit public defender. In addition, we reviewed South Carolina appellate rules and procedures, existing Appellate Division data, and a sampling of briefs and petitions filed by appellate defenders, as well as some filings provided by the court.

# Chapter 1: The Appellate Division

**History**

The Office of Appellate Defense was created by the South Carolina Legislature in 1993 to represent indigent defendants at the appellate level statewide. In 2005, the Office of Appellate Defense became a division of SCCID when the Legislature amended §17-3-310, et seq. of the South Carolina Code of Laws (1976). At that time, SCCID was responsible for roughly overseeing the indigent defense system in South Carolina, but this Commission had very little power to regulate indigent defense.

In 2007, the South Carolina Legislature passed the Indigent Defense Act of 2007, substantially expanding the role of SCCID as the administrator of the defense of indigents in South Carolina. The primary force behind the new legislation was the Executive Director of SCCID, who also is substantially responsible for a significant increase in funding for indigent defense to almost $22 million in fiscal year 2007, which makes indigent defense now primarily funded by the state. The new legislation also created a circuit public defender program and allowed for SCCID to have a greater role in establishing statewide standards, procedures, and regulations; providing for public defender training; and reviewing records and statistics to ensure effective defense delivery. The South Carolina Legislature also recently funded a new capital defense trial unit.

**Case Procedure and Assignments**

The Appellate Division handles all appeals of criminal convictions from General Sessions Court and Circuit Court including appeals ranging from capital cases to second offense DUI cases, but does not handle appeals from City Court or Magistrate Court. In addition, the office is also handling appeals of sexually violent predator (SVP) cases.

Direct appeals in South Carolina are initiated by the original trial attorney who must file a Notice of Intent to Appeal (NOI) following a client's sentencing should the client wish to appeal. Most Post-Conviction Relief (PCR) cases in South Carolina reportedly begin with a pro se filing by the defendant after trial or after direct appeal, whereby the petitioner must raise a contested issue of fact in order to get an attorney appointed for the PCR trial. We were told that PCR filings are the norm in South Carolina and that nearly all defendants get a court-appointed attorney for a PCR who, under Rule 608, need not be experienced in PCR cases or in criminal law. Following the PCR trial, the PCR attorney must file a NOI in the South Carolina Supreme Court to initiate the PCR appeal.

Once the NOI is received by the Court of Appeals or the Supreme Court, court administration sends a memorandum regarding the case to the Appellate Division that includes the defendant's name, the trial attorney's name and prior hearing date(s), although the office does not receive a copy of the NOI. However, we were told that in some cases, the Court of Appeals delays notification to the Appellate Division until (or even after) the date that the transcript is supposed to be ordered under the court rules; in addition, the Court of Appeals

reportedly does not always send all of the case information to the Appellate Division but will merely send a copy of the trial attorney's letter regarding the NOI.

If the defendant was represented by a public defender or court-appointed attorney in the lower court, then the Appellate Division will automatically take the appeal. However, if it is not apparent whether the prior attorney was court-appointed, or if the prior attorney was retained, the Appellate Division must request a copy of the Order of Appointment or an Affidavit of Indigency. (For further discussion, *see* Chapter 3, Delays in Appellate Process, Indigency Determinations). Upon receiving an Order of Appointment, the Appellate Division will take the appeal. Upon receiving an Affidavit of Indigency – which should be within 30 days – the Appellate Division must make a determination of indigency prior to accepting the case.

All new cases are tracked and maintained by one of the two Administrative Coordinators in the office until transcripts are received. The Administrative Coordinator logs new cases into a ledger or case book, assigns case numbers, and adds the cases to the office's database. For each new case, the administrative coordinator looks on the court administration's website for information regarding the case, including the name of the court reporter, and then orders the transcript(s). However, the only information on prior hearings that the office receives is what is sent from the court, and we were told that this is not always complete. For instance, a single hearing and/or single court reporter may be listed even though multiple hearings took place and/or multiple court reporters were involved. The Appellate Division will send a letter to the prior attorney to request records, though this effort is not always successful. Although court reporters have 60 days to provide transcripts, they may receive two or three 30-day extensions. During this time, the Administrative Coordinator is responsible for updating all data and handling all correspondence and calls regarding the case until the transcript is received in the office.

Checks for potential conflicts of interest (e.g., prior representation by an Appellate Defender in a current claim of ineffective assistance of counsel) are not conducted at this early stage in the office. Rather, conflict checks are conducted by the attorneys themselves after they have been assigned the case.

Once the transcript is received by the office, the attorneys have an initial 30 days to file an initial brief on a direct appeal which is limited to a maximum of 50 pages by court rule (Rule 208). However, in practice this initial period is routinely extended in 30-day increments up to five or six times in the Court of Appeals upon the attorney filing a request for extension of time. In PCR appeals, attorneys also have an initial 30 days to file a petition for certiorari which is limited to 25 pages in length (Rule 227). In the Supreme Court, this time period is routinely extended up to three times. Any two judges of the Supreme Court may grant a PCR petition which is considered without oral argument; if granted, the petitioner then has 30 days to file a brief. Although PCR appeals are to be filed in the Supreme Court, the Supreme Court can transfer the case to the Court of Appeals to be considered by a three-judge panel (Rule 227). However, should the petition fail in the Court of Appeals, there remains a right to have the petition reviewed by the Supreme Court.

After the receipt of the transcript by the Appellate Division, the Administrative Coordinator assigns the case to a staff attorney using case reports that track the number of cases each attorney has and the number of pages of transcript for each case and trying to equalize the workload according to these numbers. However, in counting the pages of trial transcripts, it is our understanding that, in PCR cases, the office does not count the transcript of the original criminal trial;[1] nor does the office count the transcript pages in state appeals cases. This office policy was not fully supported by all attorney staff; some felt it inequitable to not count transcript pages that they are ultimately responsible for reading.

Two attorneys in the office (the Chief Appellate Defender and another experienced attorney) handle all of the capital cases. For death penalty appeals, two legal assistants open all of the cases initially for these two attorneys. In order to open up a death penalty case, the legal assistant writes to the trial attorney asking for the hearing and trial dates in the case. Then she looks up the court reporters and orders all of the transcripts. The legal assistants keep a record of when all of the transcripts are received.[2] The legal assistant then writes to the trial attorney again to confirm that she has all of the correct dates of hearings and trials in the case. After the record is complete, the legal assistant gives the case to one of the two appellate defenders who handle capital cases.

With the exception of two appellate defenders handling all capital cases and one handling all SVP cases, all direct appeal and PCR cases may be assigned to any staff attorney.

**Staffing**

The Appellate Division currently employs: nine Appellate Defender attorneys (Appellate Defenders) including the Chief Appellate Defender; ten support staff including two administrative coordinators, five legal assistants or secretaries, an administrative manager; an administrative assistant; and two part-time law clerks as of the date of our last visit. According to the Chief Appellate Defender, the office is fully staffed, after hiring the latest two attorneys within the last six months.

The current Chief Appellate Defender has been with the office for over 22 years. For ten years he served as Chief Deputy and upon the retirement of the former Chief Appellate Defender became Acting Chief for one and a half years prior to becoming Chief three years ago. His responsibilities include managing the office; hiring, firing, and overseeing all personnel; and developing and implementing office policies and procedures. In addition to administrative responsibilities, the Chief handles a full caseload, including half of all death penalty appeals for the office and a mix of other cases.[3] While the office also has an attorney with the official title of Deputy Chief Appellate Defender, she does not appear to have any administrative or other duties beyond carrying a full caseload.

---

[1] We should note that although we received some conflicting information on this policy, this remains our understanding of the Appellate Division's practice.

[2] TSG was told that the Appellate Division is responsible for the task of completing the record in capital cases, a directive from the South Carolina Supreme Court.

[3] The Chief Appellate Defender indicated that he will be reducing his caseload in the near future in order to deal with administrative matters including completing performance evaluations for all staff.

Experience of the nine appellate defenders in the office ranges from a few months to over 22 years. Although all of the newer attorneys in the office have prior criminal trial or appellate experience, the office has no formal minimum qualifications for attorneys.

Over three-quarters of the support staff have been with the office for over ten years. Two administrative coordinators (one full-time and one part-time) are responsible for opening every new case except death penalty appeals, ordering transcripts and assigning the cases as described above. One of the administrative coordinators is also tasked with supervising all support staff for the office. (*See also* Administrative Oversight below.)

Five legal assistants or secretaries each support two attorneys, except for the newest assistant who supports one new attorney and handles most of the filing for the office. The legal assistants open cases assigned to their attorneys; this includes locating clients, entering data into the system, and sending the client an initial letter. The legal assistants answer phone calls from clients, assist attorneys in responding to correspondence, and close cases. In addition, they prepare briefs and petitions for court filing and organize the records on appeal and appendices for each case. It should be noted here that the work of some legal assistants is made heavier by the fact that they support one or two attorneys who either dictate or handwrite all of their briefs and correspondence, and in one instance, a legal assistant supports two attorneys who do not type any documents.

One of the most time-consuming tasks of the legal assistants involves filing requests for extension of time with the courts and managing attorneys' calendars. We were told that the legal assistants are filing, on average, ten requests for extension per attorney per day – or 20 requests per legal assistant. Needless to say, this is an excessive amount of extensions to be filing. Extensions may be filed with the Court of Appeals via e-mail, but the Supreme Court requires paper requests. For each request for extension filed, the legal assistant sends an email or prints and files the request and enters a new date on a card into the office database and into a calendar for themselves and their attorney.

The Administrative Manager position involves: processing of payroll, new employees and insurance benefits; payment of invoices; procurement of equipment; lease and new construction management; human resources management; and administrative duties. The Administrative Manager is also responsible for information technology management for the office which includes taking care of the network, operations, server, computers, and other office equipment. While on site, we also met with SCCID's Administrative Manager, who is responsible for human resources functions of SCCID; yet, as just described, some of these functions appear to be handled by the Administrative Manager of the Appellate Division. That is, there appeared to be some gray area regarding the delineation of some human resources responsibilities between the Appellate Division and SCCID.

The Appellate Division also employs an Administrative Assistant who: copies records and appendices; binds documents; makes record requests; visits clients to procure original signatures; retrieves archived files; scans transcripts of new cases; and produces and delivers documents to the courts and other agencies.

Finally, an Administrative Specialist acts as the office receptionist for both the Appellate Division and SCCID, files and performs some data entry on closed cases, sorts and delivers mail, retrieves files for other agencies, and helps with requesting files from archives.

**Standards, Policies and Procedure**

According to the Chief Appellate Defender, the Appellate Division possesses no office manual. That is, no formal, written policies and procedures exist regarding administrative and personnel issues, such as a code of conduct, office hours, outside employment, hiring and firing procedures and leave policies. While some job descriptions of administrative staff were provided to us, it is unclear whether they were formal, published descriptions as some of the staff were unaware of them. Although we were not provided with job descriptions for attorneys, we were told that the ones that exist are over 20 years old and sorely in need of updating. The office also has no formal performance standards for either attorneys or support staff, although SCCID has agency policies and procedures that are not specific to the appellate division.

In addition to such personnel matters, the Appellate Division has no written standards, polices or procedure regarding the appellate practice of the office. For instance, the office lacks any formal policy regarding client contact and has no caseload standards or set procedures to address complaints or situations of case overload for either the office or individual attorneys.

The office also does not have a formal, written policy on conflicts of interest. The general practice of the Appellate Division is to not represent clients who allege ineffective assistance of counsel of a current or previous appellate defender. Beyond this, however, it is unclear as to which cases would be deemed a conflict by the division. For instance, the office will reportedly represent co-defendants as long as separate attorneys handle each case.[4] (*See* discussion of ethics rule in systemic issues below.)

In terms of identifying conflicts on cases, each attorney is responsible for determining conflicts on the cases assigned to him/her, which takes place after the case has gone through several hands in the office. The appellate defender checks the names in a database to see if a co-worker represented the defendant on appeal or at the trial level. When an appellate defender determines there is a conflict, the attorney submits a written petition asking to be relieved of the case due to the conflict and for the court to assign outside counsel. We were told from several outside sources that the identification of conflicts happens after long delays, after the Appellate Division has had the case for several months. (For further discussion on conflict determinations, *see* Delays in Appellate Process, Conflicts of Interest below.)

---

[4] *See* South Carolina Appellate Court Rule 407, Ethics Rule 1.10(e) ( "A lawyer representing a client of a public defender office, legal services association, or similar program serving indigent clients shall not be disqualified under this Rule because of the program's representation of another client in the same or a substantially related matter if: (1) the lawyer is screened in a timely manner from access to confidential information relating to and from any participation in the representation of the other client; and (2) the lawyer retains authority over the objectives of the representation pursuant to Rule 5.4(c)).

**Training and Supervision**

The Appellate Division has no formal training requirements of staff attorneys. Appellate defenders are not required to participate in trainings other than the official 14 hours of continuing legal education (CLE) requirements for all South Carolina attorneys.[5] At the time of our visit, the Appellate Division did not appear to be holding any in-house trainings for attorneys; however, we were told that the Chief Appellate Defender was soon going to hold a training seminar on "how to write an argument heading."

Appellate defenders also do not benefit from a training manual or desk reference guide other than the appellate practice book written by the Chief Justice of the South Carolina Supreme Court. As for outside training opportunities, we were told that for the first time, the Appellate Division was paying to send several attorneys to attend the NLADA appellate training conference in New Orleans in November.

Training, supervision and mentoring are especially important for new attorneys that lack actual criminal appellate experience; they can not only provide new attorneys with greater skills and confidence, but can also improve the quality of representation provided to clients. Although new appellate defenders start with a reduced caseload and slowly build it up over several months, they have almost no training when they first arrive at the office. One attorney called the training "trial by fire." Another attorney informed us that when she started in the office there was no training, no mentoring, and no manuals. One attorney sought to train herself by asking attorneys for sample briefs and reading the past year's appellate decisions. Similarly, another attorney taught herself how to handle PCRs by looking at other attorneys' petitions.

In addition, supervision and mentoring in the office is informal and dependent upon the willingness and availability of the experienced attorneys in the office, as well as on the willingness of the staff attorneys to seek advice. When asked specifically about mentoring, one experienced attorney stated that "I'd like to think I'd be available for questions with new attorneys…but they seem to work independently." Even new attorneys do not normally receive the benefit of mooting an oral argument or having an experienced colleague accompany them to a first oral argument.

We were also told that there are no regularly scheduled evaluations or performance reviews for either attorneys or support staff, although there appeared to be some discussion of implementing them in the near future.

The Appellate Division does not possess a brief bank for all attorneys to access examples of each other's briefs. Brief banks are used by attorneys as a quick way to access legal issues and are usually set up by issue so that they are easily searchable. They can be utilized not only as a time saving method but also as a teaching tool for new attorneys or attorneys who are preparing a new issue.

Finally, attorneys do not normally review each others briefs prior to filing them, with the exception of capital cases. (*See also* Attorney Performance, Briefs.) The Chief Appellate

---

[5] *See* South Carolina Appellate Court Rule 408.

Defender reported to read some briefs of attorneys but only after they were filed. We were told by a few newer attorneys that more experienced attorneys in the office had read their first briefs before filing, but this stopped after a certain period of time. The Chief Appellate Defender would reportedly like to spend more time with the staff to improve the quality of work and to focus on supervising attorneys (both old and new attorneys), but to do so his caseload would need to be reduced.

**Administrative Oversight and Office Cohesiveness**

While responsible for the overall administration of the Appellate Division, the Chief Appellate Defender carries a full caseload, including capital cases.[6] As a result, his administrative oversight is limited, and his primary focus appears to be on providing appellate representation. The Chief Appellate Defender recognizes that his administration is limited and follows a reactive rather than proactive approach.

At the time of our last site visit, there was reportedly a plan to delegate some administrative duties, such as overseeing attorneys' leave time, to a staff attorney. It also appears that little administrative oversight of support staff takes place until or unless a problem arises, yet some personnel or administrative issues seem to have existed for some time without resolution. Issues regarding office hours and work coverage were raised by several support staff members. For instance, one employee spends more time out of the office than others, and this requires others to provide coverage in this employee's absence. Other concerns were raised regarding fair allocation of work among the support staff and willingness to provide coverage or perform others' work. Such concerns appear to have caused some resentment among staff and, while the problems may be addressed and temporarily solved, they may return without some permanent solution.

Little office-wide communication is occurring, which contributes to misperceptions, feelings of isolation and low morale. During our first visit to the office, we learned that no office-wide meetings were taking place. Although it was reported that such a meeting occurred soon after that visit and that there was an intention to hold regular staff meetings, we saw no indication upon our return that such meetings were indeed regularly being held. The lack of communication among the staff manifests itself in a number of ways. Some staff reported to be fearful for the security of their jobs following the merger with SCCID. Others complained about confusion as to certain job responsibilities such as who is responsible for implementing new directives from the court (i.e. redacting client information from the record).

The appellate defenders do not hold regular meetings to discuss cases and case strategies. As one appellate defender expressed, the attorneys in the office are like independent contractors. Another appellate defender suggested that arranging regular attorney meetings to conference cases would not only help attorneys improve legal arguments and keep abreast of recent cases but would also help them to garner support from colleagues and create office camaraderie.

---

[6] However, it was reported during the preparation of this report that the Chief Appellate Defender intends to reduce his caseload in the near future in order to deal with administrative matters.

Support staff reportedly have meetings more frequently than attorney staff, but these still do not appear to occur on any regular basis. During our second visit, we learned of one meeting that had been scheduled to occur between support staff and attorneys to address ways to improve communication between attorneys and their assistants, but the meeting was postponed.

**Salaries**

Appellate Division employees are categorized as either Attorneys or Administrative staff and are paid according to levels and grades with varying pay scales for each category. For instance, there are designations for Attorney I through Attorney IV as well as Administrative Specialist I and II; Administrative Assistant; Administrative Coordinator I and II; and Administrative Manager I and II. In terms of attorney positions, the office currently employs only experienced attorneys at Attorney III and Attorney IV levels.

No clear or written standards exist for determining salaries even at the entry level. The Chief Appellate Defender reportedly establishes entry level salaries for new attorneys and staff based on experience and ability and existing salary grades, with input regarding administrative staff from the Administrative Coordinator. For new attorney hires, the Chief Appellate Defender considers the amount of criminal law experience and the types of serious cases the attorney will be handling. For instance, an Attorney IV designation should be handling capital cases. In terms of administrative salaries, we noticed at least one large discrepancy (over $25,000).

Before the merger of the Appellate Division with SCCID in 2005, the Chief Appellate Defender reportedly sought additional funding for the office from the South Carolina Legislature but was never successful. In fact, the office had been running a deficit for many years. As a result, in the five or six years before the merger with SCCID, the Appellate Division received no salary increases at all, and the office reportedly had to take unpaid furloughs for several days or months in order to survive. The Appellate Division employees received their last raises in 2004, prior to the merger. Since then, they have not received any raises or merit bonuses, only slight cost-of-living increases on an irregular basis. Following the merger, raises must be requested by the Chief Appellate Defender and approved by the Executive Director of SCCID.

We were told that there is no salary parity between appellate defenders and Attorney General's Office attorneys, which makes it difficult for the Appellate Division to recruit and retain experienced attorneys. The salaries of the appellate defenders including the Chief Appellate Defender are not only significantly less than that of the Attorney General's Office attorneys but also of the new Circuit Public Defenders.[7]

---

[7] *See* ABA Ten Principles Of a Public Defense Delivery System (ABA Feb. 2002), Principle 8 and Comment; National Advisory Commission on Criminal Justice Standards and Goals, Task Force on Courts, Chapter 13, *The Defense* (1973), Standards 13.7, 13.11 (commenting on salary parity between the prosecution and defense functions). However, the Attorney General's Office and the Circuit Public Defenders may have other job responsibilities that the Appellate Defenders do not have. To be clear, we are not advocating equal pay between the Attorney General's Office, Circuit Public Defenders, and Appellate Defenders; we are supporting the notion that their salaries should be more in line than they are currently.

**Office Space and Resources**

The Appellate Division shares physical office space with SCCID in downtown Columbia, South Carolina. The office is conveniently located across the street from the South Carolina Supreme Court and Court of Appeals, and various other state offices are nearby.

Some office locations of Appellate Division staff have been in flux. When we visited the Appellate Division, we were told that the lack of office space is a recurring problem. While almost every employee including support staff has an office except for the receptionist, some space problems do exist. The newest attorney hired did not have an office for several weeks while they were building out the office space. However, at the time of this report we were told that office locations and space are not an issue any longer.

All staff members have desks, computers, and phones. The office also contains a research library. Files are kept in two rooms that are centrally located in the office. Additionally, all attorneys have access to Westlaw for conducting online legal research both in the office and at home for use during non-business hours.

**Case Management System**

The Appellate Division's case management system is currently a Microsoft Access based database. The system contains enough essential information to track and count cases, and perform some rudimentary document generation functions, but is not sufficiently robust to be used as a case management tool for attorneys. The division should consider whether to upgrade the current system to keep track of a few more essential elements of information, or to put in a new case management system altogether. One thing to consider in making this choice is whether the current system can be adapted to make use of a planned document management system for the office.

Although the Division has begun the process of seeking a document management solution to scan and store case-related documents and filings, they are just beginning the process, and case-related documents, whether created in-house or scanned, are not currently available via the case management system.

One of the shortcomings of the current system is the lack of a readily available reporting feature. The system is not sufficiently documented to readily understand what each of the data elements means, and the reports provided by the system give users very little opportunity to produce meaningful reports. Whether the current system is improved or a new system is selected, access to readily available and meaningful reporting tools should be a priority.

For instance, the office had been recording the charges in each case in its database in a field entitled Charge1. However, the office has recently begun using the Charge1 field in the database to list the type of hearing that was held; that is, whether the case is for a guilty plea, a trial, or a probation revocation hearing. Now that field cannot be used to get either the charges or the type of hearing held. It has been rendered useless for data management purposes and for generating reports. The office database should have separate fields, one allowing the office to track the type of hearing held and another field that tracks the offense.

14

One concern expressed to us was that the current case categories are too broad, and we concur with this assessment. Specifically, in the current data system, the cases are categorized into type, such as juvenile, death penalty, cross-appeal, and "normal." The "normal" category includes everything from shoplifting to murder, and comprises by far the largest number of cases. We suggest breaking down the "normal" category into smaller sections by seriousness level of the underlying charge (such as A felony, B felony, etc.), or by type of charge (such as Crime against the Person, Property Offense, etc.).

Finally, it would also be helpful to separate out cases in which the Appellate Division is the appellant, which is the vast majority of the cases, from the cases in which the Appellate Division is respondent. Currently, We Are Respondent (WAR) is a case type, which means that if the Appellate Division is the respondent in a death penalty case the person inputting the data must choose between these two options. Making a separate field for respondent versus appellant would allow the office to keep track of both when they are the respondent and the type of case in which they are responding.

**Caseload/Workload**

The Appellate Division is operating under a crushing caseload. While overall appointments being made to the office have fallen since 2002, the number of open cases (i.e., cases being handled by the office at any given point in time) has remained extremely high, the number of cases being disposed of per attorney is extremely high, and the number of briefs filed each year is staggering.

Caseload/Workload Standards

The only national source that has attempted to quantify a maximum public defender caseload is the National Advisory Commission (NAC), which published its standards in 1973.[8] The NAC recommended that a full-time public defender working exclusively on criminal appeals handle no more than 25 cases per year. While the NAC standards are not empirically based and we do not suggest that they be applied per se to the Appellate Division, they are useful as a touchstone for comparison. Commentary to ABA and NLADA standards further support some reliance on these standards.

Another informative source for proper appellate caseload numbers is a 1994 Florida Supreme Court opinion,[9] in which the Court cited a Special Commissioner's report that looked at the productivity and workload of Florida's Second District Court of Appeals (following a motion by the district's Public Defender based upon assigned excessive caseloads). The Commissioner held hearings over a number of days and reviewed considerable evidence on appellate standards and practices adopted by state and national groups. Such evidence included a survey of a number of states that concluded that "in the majority of states, attorneys filed between twenty to

---

[8] *National Advisory Commission on Criminal Justice Standards and Goals: Courts*, Standard 13.12, Washington, D.C., (Jan. 1973).
[9] *In re Certification of Conflict in Motions to Withdraw Filed by Pub. Defender of the Tenth Judicial Circuit*, 636 So. 2d 18 (Fla. 1994).

thirty initial briefs per year. None of the surveyed states do more than fifty cases per year."[10]  By any standard, and in our experience, the South Carolina appellate defenders' caseloads are excessively high.  (*See* discussion on Case Dispositions and Briefs Filed below).

Case Appointments

Table 1 lists the number of appointments the Appellate Division received between 2002 and 2007 from each of the appellate courts and their combined totals.  These numbers are further refined to show the type of appeal.

Table 1 - Case Appointments

| Case Appointments | | | | | | | |
|---|---|---|---|---|---|---|---|
| Court | Type of Appeal | Year Appointed | | | | | |
| | | 2002 | 2003 | 2004 | 2005 | 2006 | 2007 |
| Court of Appeals | Direct | 596 | 587 | 499 | 571 | 585 | 591 |
| | PCR | 1 | 37 | 94 | 231 | 35 | 2 |
| | Total | 597 | 624 | 593 | 802 | 620 | 593 |
| Supreme Court | Direct | 19 | 12 | 12 | 14 | 8 | 8 |
| | PCR | 605 | 557 | 428 | 244 | 477 | 410 |
| | Total | 624 | 569 | 440 | 258 | 485 | 418 |
| Both Courts | Direct | 615 | 600 | 511 | 585 | 593 | 599 |
| | PCR | 606 | 594 | 522 | 475 | 512 | 412 |
| | Total | 1221 | 1194 | 1033 | 1060 | 1105 | 1012 |

The Appellate Division was appointed in over 1,000 cases in each of the past five years, though annual appointments to the Appellate Division have declined during that time.  In 2002, the Appellate Division was assigned 1,221 cases, but by 2007 that number declined by 17% to 1,012 appointments.  While the number of direct appeals assigned to the office remained relatively constant over that time, the number of PCR appointments dropped dramatically by 32% (from 606 to 412).  *See* Table 1.

Unfortunately, the decline in total case appointments to the office does not translate into a decline in overall workload.  In fact, workload has remained high and even increased.  Since 2002, the number of open cases in the office and per attorney has increased; the number of case dispositions occurring in the office and per attorney has increased; and the number of briefs being filed has also increased. The result is an overwhelming and increasing workload.

---

[10] *Id.* at 20-21 (The study was prepared by TSG in connection with the case).

Open Cases

An open case is defined as one that has been assigned to the Appellate Division, but has not yet received a disposition. These cases may have been assigned to the Appellate Division in previous years, but because the decision from the Court has not yet been received, it remains an open case – even if all of the briefs and the record on appeal have been filed. Table 2 lists the open cases in the Appellate Division at a given point in time (October) by year and by court.

Table 2 - Open Cases in October of Each Year, 2002-2007

| Open Cases in October of Each Year, 2002-2007 | | | | | | |
|---|---|---|---|---|---|---|
| Court | Year | | | | | |
| | 2002 | 2003 | 2004 | 2005 | 2006 | 2007 |
| Court of Appeals | 1349 | 1381 | 1315 | 1576 | 1820 | 1721 |
| Supreme Court | 978 | 980 | 912 | 800 | 843 | 954 |
| Total | 2333 | 2367 | 2231 | 2380 | 2667 | 2680 |

As Table 2 demonstrates, the number of open cases in the office in October of each year remained relatively steady from 2002 to 2005 but jumped by 15% to 2,680 cases over the last two years.

During our site work, most attorneys who were working at full capacity reported (in October 2007) to be handling open caseloads of between 200-250 appeals, although new attorneys were still building up to full capacity and had smaller caseloads. The data below seems to indicate that this estimate is accurate. Table 3 lists the open caseloads in October of each year since 2002 for the five experienced attorneys who were working at full capacity during each of those years.

Table 3 - Open Cases in October of Each Year, 2002-2007, for Five Experienced Attorneys

| Open Cases in October of Each Year, 2002-2007, for Five Experienced Attorneys | | | | | | |
|---|---|---|---|---|---|---|
| Attorney | Year | | | | | |
| | 2002 | 2003 | 2004 | 2005 | 2006 | 2007 |
| Attorney One | 209 | 241 | 223 | 227 | 271 | 266 |
| Attorney Two (Capital) | 123 | 167 | 229 | 262 | 281 | 202 |
| Attorney Three (Capital) | 137 | 158 | 229 | 268 | 274 | 184 |
| Attorney Four | 230 | 247 | 225 | 295 | 355 | 261 |
| Attorney Five | 226 | 256 | 251 | 307 | 367 | 296 |
| Total for Five Experienced Attorneys | 925 | 1069 | 1157 | 1359 | 1548 | 1209 |

The five experienced attorneys in the office had 1,209 open cases in 2007. The two attorneys that worked on capital appeals had lower open caseloads than those attorneys who did not. It should also be noted that two of the attorneys had the bulk of the PCR appeals for some time, and that may lead to a higher current caseload for those attorneys.

Of these five attorneys, the average open caseload rose significantly by 31%, from 185 in 2002 to 242 in 2007. In 2006, the average open caseload was even worse, at 310 cases per attorney. Even the attorneys handling capital cases have had extremely high open caseloads in each of the past six years. In 2007, the lowest open caseload among these five attorneys was 184 (a capital attorney), while the highest was 296. Again, these figures were even worse in 2006, with the lowest open caseload at 274 (a capital attorney) and the highest at a shocking 367.

Case Dispositions

The number of cases disposed of by appellate defenders is also on the rise.[11] In 2007, the Appellate Division disposed of 942 cases. This is a significant increase in dispositions over the previous years, as Table 4, which gives the number of overall dispositions by year and court, illustrates.

Table 4 – Case Dispositions

| Case Dispositions by Court | | | | | | | |
|---|---|---|---|---|---|---|---|
| Court | Year of Disposition | | | | | | |
| | 2001 | 2002 | 2003 | 2004 | 2005 | 2006 | 2007 |
| Court of Appeals | 323 | 523 | 484 | 442 | 411 | 315 | 654 |
| Supreme Court | 271 | 190 | 221 | 217 | 223 | 336 | 288 |
| Total | 594 | 713 | 705 | 659 | 634 | 651 | 942 |

Overall, the Appellate Division disposed of 594 cases in 2001; by 2007, this number rose significantly by 59%.

In order to show case dispositions per attorney, Table 5 below lists the dispositions by attorney for the same five experienced attorneys used above who were working at full capacity during each of the last six years.

---

[11] A case disposition does not occur until the office receives a final court opinion on the case; therefore, a case disposition may occur well after the attorney has completed filing the brief and the record in a case.

Table 5 – Case Dispositions for Five Experienced Attorneys

| Case Dispositions for Five Experienced Attorneys | | | | | | |
|---|---|---|---|---|---|---|
| Attorney | Year of Disposition | | | | | |
| | 2002 | 2003 | 2004 | 2005 | 2006 | 2007 |
| Attorney One | 53 | 49 | 61 | 99 | 65 | 98 |
| Attorney Two (Capital) | 53 | 48 | 33 | 79 | 58 | 97 |
| Attorney Three (Capital) | 48 | 29 | 44 | 105 | 74 | 109 |
| Attorney Four | 85 | 67 | 83 | 61 | 143 | 230 |
| Attorney Five | 82 | 147 | 108 | 24 | 77 | 223 |
| Total for Five Experienced Attorneys | 321 | 340 | 329 | 366 | 417 | 757 |

Table 5 shows that the vast majority of the cases disposed of were attributable to the five experienced attorneys in the office in 2007. In fact, 80% of all of the cases disposed of in 2007 were by these five attorneys, whereas in 2002 that number was 45%, which indicates a more even distribution. Among these five attorneys, the average number of annual case dispositions rose from 62 in 2002 to an alarming 151 in 2007.

Briefs Filed

Since 2002, the number of briefs filed each year by the office has increased. As Table 6 demonstrates, the Appellate Division filed 965 briefs in 2007. This is an enormous increase over 2005 and 2006, in which 829 and 827 briefs were filed, respectively. It is important to note, however, that the number of briefs filed in 2005 and 2006 were extremely high, as well.

Table 6 –Briefs Filed by the Appellate Division Per Year

| Briefs Filed Per Year | | | | | | |
|---|---|---|---|---|---|---|
| Court | Year Brief Filed | | | | | |
| | 2002 | 2003 | 2004 | 2005 | 2006 | 2007 |
| Court of Appeals | 485 | 439 | 422 | 546 | 553 | 569 |
| Supreme Court | 412 | 513 | 442 | 283 | 274 | 395 |
| Total | 897 | 952 | 864 | 829 | 827 | 965* |

* One brief filed had no court designation.

Of the 965 briefs filed in 2007, 569 were filed in the Court of Appeals and 395 were filed in the South Carolina Supreme Court. *See* Table 6. During this year, one of the attorneys was out on medical leave for a period of time, and two of the attorneys were just hired and carrying reduced caseloads. Even if the Appellate Division had a full-time staff of nine attorneys working

all year, that amounts to more than 100 briefs filed per year per attorney.[12]  Since the office was short-staffed, the number of briefs filed per attorney is actually much higher.

Indeed, the Chief Appellate Defender reports that the average appellate defender should be handling approximately 500 pages of transcript and filing one brief per week.  However, in speaking with appellate defenders, many were filing between two and four briefs or PCR petitions per week, and on occasion some were forced to file a brief per day.  Most briefs in the office appear to average between seven and ten pages in length; some no-merit briefs may be closer to three pages.  Despite some attorneys reportedly working at night and on weekends, they further reported that they are unable to keep up with their workload.

The data supports the office's contention that individual attorneys are filing more than one brief a week.  The data in Table 7 details the number of briefs filed each year by the five experienced appellate defenders, as well as the weekly average for 2007.

Table 7 - Briefs Filed by Five Experienced Attorneys

| Briefs Filed by Five Experienced Attorneys | | | | | | | |
|---|---|---|---|---|---|---|---|
| Attorney | Year Brief Filed | | | | | | Weekly Average for 2007[13] |
| | 2002 | 2003 | 2004 | 2005 | 2006 | 2007 | |
| Attorney One | 118 | 136 | 111 | 81 | 101 | 126 | 2.5 |
| Attorney Two (Capital) | 40 | 35 | 101 | 85 | 128 | 92 | 1.8 |
| Attorney Three (Capital) | 34 | 30 | 81 | 95 | 100 | 83 | 1.7 |
| Attorney Four | 155 | 174 | 159 | 172 | 184 | 180 | 3.6 |
| Attorney Five | 152 | 146 | 140 | 160 | 171 | 171 | 3.4 |
| Total for Five Experienced Attorneys | 499 | 521 | 592 | 593 | 684 | 652 | 13.0 |

As the above data demonstrates, in 2007, each of the five experienced attorneys filed an average of between 1.7 and 3.6 briefs per week, with the capital attorneys on the lower end of the scale and the attorneys who mostly handled PCR appeals on the higher end.  Combined, the average number of briefs filed by an experienced appellate defender was 2.6 per week in 2007.

Delays Filing Briefs

Under these increased caseload pressures, the amount of time it took the Appellate Division to file a brief in 2007 increased significantly from 2002.  Table 8 looks at the length of time needed by the Appellate Division to file a brief, once it received the transcript, as well as

---

[12] In fact, this number of more than 100 briefs per appellate defender would translate to appellate defenders in South Carolina handling more than four times the number of cases recommended by the NAC standard and double the workload capacity of appellate defenders in other states.  *In re Certification of Conflict in Motions to Withdraw Filed by Pub. Defender of the Tenth Judicial Circuit*, 636 So. 2d 18, 20-21 (Fla. 1994); *National Advisory Commission on Criminal Justice Standards and Goals: Courts*, Standard 13.12, Washington, D.C., (Jan. 1973).
[13] We assumed 50 work weeks per year.

the length of time to file the Record on Appeal, over the past five years. The table is further divided by court.

Table 8 - Average Time to File Appellate Brief

| Average Time to File Appellate Brief | | | |
|---|---|---|---|
| Court | Year of Disposition | Average Time from Receiving Transcript to Filing Brief (Days) | Average Time from Filing Brief to Filing Record on Appeal (Days) |
| Court of Appeals | 2002 | 117 | 93 |
| | 2003 | 117 | 88 |
| | 2004 | 133 | 91 |
| | 2005 | 196 | 103 |
| | 2006 | 208 | 115 |
| | 2007 | 188 | 120 |
| Supreme Court | 2002 | 132 | 127 |
| | 2003 | 120 | 111 |
| | 2004 | 139 | 181 |
| | 2005 | 132 | 200 |
| | 2006 | 114 | 192 |
| | 2007 | 118 | 201 |
| Both Courts | 2002 | 121 | 94 |
| | 2003 | 118 | 89 |
| | 2004 | 135 | 95 |
| | 2005 | 174 | 105 |
| | 2006 | 158 | 122 |
| | 2007 | 167 | 122 |

In 2007, it took an average of 167 days for the Appellate Division to file a brief once it received the transcript. *See* Table 8. This was up 38%, from 121 days in 2002. The Appellate Division also required more time to file the Record on Appeal. In 2007, the Appellate Division averaged 122 days to file the Record on Appeal, whereas the staff averaged 94 days in 2002. *See* Table 8. The data indicates that the delays are partially attributable to both an increase in the time needed to file a brief, as well as an increase in the time it took the Appellate Division to complete the Record on Appeal.

The increased delays in completing appeals have occurred overwhelmingly in the Court of Appeals. In 2002, on average, a brief was filed in the Court of Appeals 117 days after the Appellate Division received the transcript. By 2006, this number had ballooned to 208 days, though in 2007 the number of days to file a brief fell slightly to 188. Between 2002 and 2007, this amounted to an overall increase of 60%. At the same time, the amount of time the Appellate

21

Division needed to file the Record on Appeal grew from 93 days in 2002 to 120 days in 2007. It took the Appellate Division approximately three months longer to file a brief in the Court of Appeals than it did in 2002 – an extra two months to file the brief and an extra month to file the Record on Appeal.

The amount of time the Appellate Division has taken to file a brief in the Supreme Court has remained steady at around four months since 2002. Unfortunately, the time it took them to file the Record on Appeal rose from 127 days in 2002 to 201 days in 2007, an increase of over 50%.

<u>Attempts to Address Caseload</u>

The Appellate Division recognizes that they are overburdened with cases. Unfortunately, the problem has existed for some years, and the courts are similarly cognizant of the problem. In March 2003, the prior Chief Appellate Defender filed petitions in the Court of Appeals and in the Supreme Court seeking to relieve the office of its heavy caseload, which consisted of 978 new cases in 2001 and 1,221 new cases in 2002. The petitions stated that due to "current and future budget which will substantially impede [the office's] ability to continue providing constitutionally effective representation for [their] clients on appeal," the office was seeking to have outside counsel appointed for cases in certain categories that were not yet assigned. In the Court of Appeals, the Chief sought relief from four categories of cases, including appeals of guilty pleas.[14] In the Supreme Court, relief was sought from all second and successive post-conviction relief cases and matters pursuant to *Al-Shabazz v. State*.[15] The petitions, however, were unsuccessful.

In late 2004, a staff attorney filed a petition for the appointment of outside counsel in 36 of her pending appeals before the Court of Appeals – a matter that was certified in part before the Supreme Court – alleging a conflict of interest and inability to provide the clients with effective assistance of counsel due to her excessive caseload. The Acting Chief Appellate Defender (now the current Chief), along with the Commission, opposed the petition which had not been authorized by the office or the Commission. The Chief stated at the time that while the caseloads were not optimal, they were manageable, and that the petitioner had the lightest caseload in the office. In January 2005, the Supreme Court issued an order denying the petition.[16] The Court cited the South Carolina Ethics Advisory Opinion regarding a public defender's ethical obligations and excessive caseloads. Similar to the ABA Ethics Opinion in 2006,[17] the South Carolina opinion requires a staff attorney, if she does not receive a satisfactory response from her supervisor, to raise the issue with the agency's board of directors, and also to refuse additional appointments prior to seeking to withdraw from current appointments. Because the staff attorney had not pursued these means for addressing the problem, her petition was denied.

---

[14] Other case categories were: habeas corpus appeals; Municipal and Magistrate court convictions; and appeals where clients have not received an active jail sentence.

[15] 338 S.C. 354 (1999).

[16] *In Re: Tara S. Taggart*, Supreme Court of South Carolina (Jan. 6, 2005).

[17] ABA Formal Opinion 06-441, Ethical Obligations of Lawyers Who Represent Indigent Criminal Defendants When Excessive Caseloads Interfere With Competent and Diligent Representation (May 13, 2006). Note that this opinion was attached to the South Carolina Supreme Court's Commission on Lawyer Conduct Letter of Caution to the Appellate Division in September 2007 regarding inadequate responses to clients' requests for information.

Although the current staff at the Appellate Division, in filing for extensions of time, use standard language regarding an overwhelming workload, the current Chief Appellate Defender has not yet sought to refuse or withdraw from cases. Rather, in June 2007, he sought a change in procedure that would relieve the office of its numerous, and largely futile cases involving direct appeals of guilty pleas. The Chief Appellate Defender argued in the initial brief of client Michael Thrift that Thrift's trial judge erred when he informed Thrift that he had a right to appeal his guilty plea if he disagreed with the proceedings or the sentence. The brief explains that "facially-valid guilty pleas currently account for roughly 40% of the direct appeals handled by this office." The brief suggests that "the Supreme Court should adopt a procedure in direct appeals of guilty pleas akin to that adopted by the Court in situations involving post-conviction relief actions dismissed as successive or untimely… [which] would require the appellant or his counsel to provide an explanation, at the time the notice of intent to appeal is filed, why it should not be summarily dismissed" (citing Appellate Court Rule 227(c)). We were told that the Court recently proposed a rule change to require the appellant who is attempting to appeal a guilty plea to file a written explanation showing that there exists an appealable issue; if the appellant does not make that showing, then the appeal would be dismissed.[18] This amended procedure should result in a reduction of the Appellate Division's caseload somewhat.[19]

Nevertheless, it should be remembered that even if the Appellate Division were no longer assigned direct appeals of guilty pleas, their caseloads would still be inordinately high. In 2007, the Appellate Division was assigned to 599 direct appeals. *See* Table 1. If between 40% and 49% of all of the direct appeals are presumed to be guilty pleas, this would reduce the caseload by between 240 and 293 cases.[20] The Appellate Division would still be assigned between 719-772 new cases each year. This number is on top of the cases they already have and equates to approximately 80 new cases per attorney, which is more than three times higher than the NAC standards referenced above.

---

[18] We were told that amendments to South Carolina Appellate Court Rules must be either approved or rejected by the South Carolina Legislature; however, if the Legislature does not act within 60 days, the proposed rule becomes law.

[19] The Attorney General objected to the Court adopting such a procedure in *Thrift*. Essentially the proposed rule change would allow facially-valid guilty pleas to bypass direct appeal in favor of post-conviction relief.

[20] The Appellate Division estimated in *Thrift* that 40% of all direct appeals were from guilty pleas. They reported that 49% of the direct appeals filed between May 1, 2007 and January 4, 2008 were from guilty pleas.

**Attorney Performance**

Given the caseload problems in the office, it is not surprising that several issues exist related to attorney performance. One of the greatest problems with any attorney handling an overwhelming caseload is the risk of failing to discover certain facts or issues to be pursued that could make a difference in the outcome of a client's case. At the Appellate Division, attorneys are forced to invent shortcuts and most appear to be doing the bare minimum to perform the work that is required of them. During our site work, a few attorneys were quite candid about their struggles. One attorney who would like to spend more time reading transcripts is sometimes only able to look at objections. One attorney noted that when you are rushing to get a brief out in a case, "it's a grievance waiting to happen." Another attorney declared that although they are doing the best they can – enough to satisfy the *Strickland* standard, [21] the work is nothing to be proud of.

Although these attorneys were candid about their concerns, they do not feel they have any option but to continue to press on with their current workload.

Client Contact/Correspondence

Except in capital cases, attorneys do not normally meet with their clients, most of whom are housed in jails all across the state. Given the burdensome caseloads and the time and cost of travel that would be involved, in-person meetings with all clients are clearly not feasible. However, there may be some instances when a trip to a nearby prison would go a long way toward improving attorney-client relations.

The appellate defenders also often lack the time to adequately respond to client correspondence. One attorney admitted to not responding to every client letter, although this attorney will take phone calls from clients. Another attorney responds to client letters with a form letter. In some cases, it may be unrealistic for an attorney to respond to every client correspondence. For instance, one attorney described a client who contacts the attorney daily. However, the attorney had not previously considered that visiting the client, who was housed in a prison nearby, could improve relations and possibly deter the daily letters.

In 2007, the South Carolina Supreme Court Commission on Lawyer Conduct investigated allegation(s) of lack of client contact by the appellate defenders. While an investigative panel did not make a finding of misconduct, it did issue a "Letter of Caution" to the Appellate Division, advising the office to "be more careful to adhere to guidelines set out in the *Rules of Professional Conduct*, particularly those set out in Rule 1.4(a)(4), which requires a lawyer to comply with reasonable requests for information." [22] The letter references and attaches the 2006

---

[21] *Strickland v. Washington*, 466 U.S. 668 (1984), sets a very low standard regarding ineffective assistance of counsel (Defendant must show that counsel made errors so serious that counsel was not functioning as the "counsel" guaranteed the defendant by the Sixth Amendment and that the deficient performance prejudiced the defense).
[22] Supreme Court of South Carolina Commission on Lawyer Conduct, Letter of Caution, Case No. 07-DE-L-0186 (Sept. 27, 2007).

ABA Ethics Opinion regarding the ethical obligations of attorneys representing indigent defendants when excessive caseloads interfere with competent and diligent representation.[23]

In response to recent criticism regarding the lack of client contact, some appellate defenders have reportedly begun sending form letters to clients regarding, for example, the process by which an inmate may respond to appellate counsel's filing of a no-merit brief. Additionally, one of the two part-time law clerks in the office has been assigned to respond to client letters.

Continuances

Additionally, given the workload, it is not surprising that staff attorneys are routinely requesting the maximum number of extensions allowed per case by the courts. In the Court of Appeals, attorneys are seeking five or six 30-day extensions of time in filing direct appeals. In the Supreme Court, attorneys are seeking three such extensions of time on PCR appeals. Because of their caseload burden, attorneys are not normally reading the entire record and working on the brief to be filed until several extensions have been filed and a case is approaching the final deadline.

Table 9 lists the average number of extensions requested, per brief, in each of the courts, and overall from 2002 to 2007.

---

[23] ABA Formal Opinion 06-441 (May 13, 2006).

Table 9 – Average Number of Extensions Per Brief

| Average Number of Extensions Per Brief | | | | |
|---|---|---|---|---|
| Court | Year of Disposition | Merit Briefs | No-Merit Briefs | All Briefs |
| Court of Appeals | 2002 | 2.1 | 1.5 | 1.7 |
| | 2003 | 2.5 | 1.6 | 1.9 |
| | 2004 | 2.5 | 1.9 | 2.0 |
| | 2005 | 3.1 | 2.9 | 2.9 |
| | 2006 | 2.9 | 2.9 | 2.9 |
| | 2007 | 4.3 | 2.6 | 3.0 |
| Supreme Court | 2002 | 2.2 | 1.9 | 2.0 |
| | 2003 | 2.0 | 1.8 | 1.9 |
| | 2004 | 2.3 | 2.3 | 2.3 |
| | 2005 | 2.3 | 2.3 | 2.3 |
| | 2006 | 1.9 | 1.5 | 1.6 |
| | 2007 | 2.3 | 1.7 | 1.9 |
| Both Courts | 2002 | 2.1 | 1.6 | 1.8 |
| | 2003 | 2.3 | 1.7 | 1.9 |
| | 2004 | 2.4 | 2.0 | 2.1 |
| | 2005 | 2.7 | 2.7 | 2.7 |
| | 2006 | 2.3 | 2.1 | 2.2 |
| | 2007 | 3.4 | 2.4 | 2.7 |

In the Court of Appeals, the Appellate Division requested an average of 1.7 extensions per brief in 2002; by 2007, the appellate defenders were requesting an average of 3.0 extensions per brief. This increase in extensions affected both no-merit and merit filings. The number of extensions requested for no-merit filings grew from an average of 1.5 per brief in 2002 to an average of 2.6 per brief five years later. At the same time, the number of extensions requested for merit filings more than doubled, averaging 4.3 extensions in 2007, up from 2.1 extensions in 2002. *See* Table 9. Assuming that merit briefs are filed from longer trial transcripts, and knowing that more in-depth research must be conducted for merit filings, it is not surprising that merit briefs would require more extensions than no-merit briefs. Nonetheless, the increase in extensions being sought is significant for all filings.

In the Supreme Court, the number of extensions requested by the Appellate Division remained at an overall average of two per brief since 2002. As would be expected, merit briefs required a slightly higher average number of extensions (2.3) than did no-merit briefs (1.7).

Briefs

Except for capital cases, attorneys do not review other attorneys' briefs prior to filing. They simply do not have the time. In reviewing sample briefs from each attorney in the office, it also became apparent that in some cases, no proofreading is taking place at all. In the filings of a few attorneys, we noticed several typographical and grammatical errors.

We also heard from several outside sources that some appellate defenders - even experienced ones - are making blatant mistakes in their briefs. For example, briefs have been filed with: an irrelevant boiler plate argument that was clearly lifted from another brief; a referral to the defendant's "guilty plea" when in fact the appeal is from a trial; and reference to the defendant by the wrong name. The appellate courts have complained to the Appellate Division regarding these issues. At least one person in the appellate courts specifically articulated a concern about "inefficiencies" and "complacent" appellate lawyering within the office.

Unfortunately, the courts have also complained that some Appellate Division attorneys are not following proper procedure in filing appeals from PCR claims in certain circumstances. Specifically, under *White v. State*, if a person's claim at a PCR hearing is that trial counsel failed to file a Notice of Intent to Appeal, the judge makes a finding as to whether the defendant knowingly and intelligently waived his right to a direct appeal. If the judge finds that the defendant did not properly waive his right to appeal, the judge cannot grant him the right to appeal. Instead, appellate counsel must file two separate documents: (1) a writ of certiorari asking to be heard on the direct appeal issues and raising any other issues from the post-conviction relief hearing; and (2) a brief raising all of the issues they would have raised on direct appeal. Contrary to this procedural requirement, some appellate defenders are either not sending a brief of the direct appeal issues or are sending the direct appeal issues in the same document.[24]

Similarly, if a defendant is filing a second PCR claim alleging the original PCR attorney's failure to file an appeal and did not waive his right to appeal the denial of the original PCR claim, under *King v. State*, the appellate attorney must file two writs: (1) a writ for certiorari to be heard on belated review based on the lower court's finding that the defendant did not waive his right to appeal, and (2) a writ for certiorari raising all the issues that would have been raised on an appeal from the denial of the PCR claim. Again, Appellate Division attorneys are not always following this procedure properly.

Finally, it is worth noting that the office does not follow a single standard format for its briefs. Rather, attorneys appear to follow their own format. For instance, some briefs have sections for Statements of Fact which, based on our review of sample briefs, rendered the briefs more persuasive than those without them; yet some briefs simply listed the minimal facts necessary in the legal argument section.

No-Merit Briefs

In light of the high caseloads and the large number of appeals of guilty pleas, it is no

---

[24] *See Davis v. State*, 342 S.E.2d 60 (1986) (explaining the procedure to be followed in these circumstances); *see also* Rule 227(i).

27

wonder that *Anders* and *Johnson* appear to have become a mechanism for the Appellate Division to control its workload. (*See also* Systemic Issues chapter for discussion of appeals of guilty pleas). As one attorney reported, however, the office is still working to understand and implement the *Anders* rule. In *Anders v. California*, the Supreme Court stated:

> if counsel finds his case to be *wholly frivolous*, after a
> conscientious examination of it, he should so advise the court and
> request permission to withdraw. That request must, however, be
> accompanied by a brief referring to anything in the record that
> might arguably support the appeal. A copy of counsel's brief
> should be furnished to the indigent and time allowed him to raise
> any points that he chooses; the court -- not counsel -- then
> proceeds, after a full examination of all the proceedings, to decide
> whether the case is wholly frivolous.[25]

The Court of Appeals has complained that the Appellate Division is filing too many *Anders* briefs on direct appeal. Some at the Supreme Court also expressed a concern that too many no-merit or *Johnson* PCR petitions are also being filed by the office. These concerns are supported by the data. Table 10 shows the overall percentage of completed appeals in which no-merit briefs were filed by the office.

Table 10 – Percentage of Merit and No-Merit Briefs Filed on All Appeals

| All Appeals | | | | | | | |
|---|---|---|---|---|---|---|---|
| Brief Filed | Year of Disposition | | | | | | |
| | 2001 | 2002 | 2003 | 2004 | 2005 | 2006 | 2007 |
| Merit | 43% | 40% | 33% | 24% | 22% | 25% | 27% |
| No-merit | 57% | 60% | 67% | 76% | 78% | 75% | 73% |

The number of no-merit briefs filed by the Appellate Division is very high. In 2001, 57% of the cases disposed of were no-merit brief filings. By 2007, this number had increased to 73% of all dispositions, although it should be noted that this is down from a high of 78% in 2005.

This data is particularly troubling in the case of direct appeals. Table 11 gives the percentage of completed direct appeals in which no-merit briefs were filed by the office.

---

[25] 386 U.S. 738, 743 (1967) (emphasis added).

Table 11 - Percentage of Merit and No-Merit Briefs Filed on Direct Appeals

| Direct Appeals | | | | | | | |
|---|---|---|---|---|---|---|---|
| Brief Filed | Year of Disposition | | | | | | |
| | 2001 | 2002 | 2003 | 2004 | 2005 | 2006 | 2007 |
| Merit | 47% | 36% | 32% | 21% | 19% | 29% | 27% |
| No-merit | 53% | 64% | 68% | 79% | 81% | 71% | 73% |

The data indicates that no-merit briefs on direct appeals increased from 53% in 2001, to 73% in 2007. The Appellate Division reports that almost half of all its direct appeals being filed are from guilty pleas.[26] Even assuming that a no-merit brief was filed in every direct appeal of a guilty plea, the Appellate Division still disposed of almost 50% of its remaining direct appeals, deriving mainly from trial transcripts, through no-merit briefs.[27] Based on our experience, this number is unreasonably high.

With respect to PCR appeals, the data indicates the same trend of increasing rates of no-merit brief dispositions. Table 12 gives the percentage of completed PCR appeals in which no-merit briefs were filed.

Table 12 - Percentage of Merit and No-Merit Briefs Filed on PCR Appeals

| PCR Appeals | | | | | | | |
|---|---|---|---|---|---|---|---|
| Brief Filed | Year of Disposition | | | | | | |
| | 2001 | 2002 | 2003 | 2004 | 2005 | 2006 | 2007 |
| Merit | 38% | 51% | 35% | 30% | 26% | 23% | 26% |
| No-merit | 62% | 49% | 65% | 70% | 74% | 77% | 74% |

In 2001, 62% of PCR appeals completed were no-merit brief filings. By 2007, this number had increased to 74%. These numbers are similar to those of direct appeals.

Indeed, in order to ensure that appellate counsel's assertion that an appeal has no merit is a valid one, the Court's staff attorneys review a "check list" of possible preserved issues for each filing. Although the attorneys are reportedly making an effort to respond to the Court of Appeal's concern, some no-merit filings are nonetheless returned by the Court – after review by Court staff attorneys – directing the attorney to brief the merits of a particular issue.[28]

---

[26] A reported 49% of the direct appeals filed between May 1, 2007, and January 4, 2008 were from guilty pleas.

[27] To calculate this number, we started with the premise that for every 100 briefs filed on direct appeal, approximately 50% were for guilty pleas (as reported by the Appellate Division) and 50% were for the remaining direct appeals of non-guilty pleas or, for the most part, trials. Assuming that all 50 briefs filed for guilty pleas were filed as no-merit briefs, then 23 of the remaining 50 briefs on direct appeals, or 46% were no-merit briefs (73 no-merit briefs total – 50 no-merit guilty pleas).

[28] We should add that in our review of a few of these filings, without reading the transcripts, we agree with the Court's decision to send them back for further briefing. In one case in particular, one attorney had represented two

Because the Court staff must review the record to ensure that a no-merit brief is being properly filed, and the number of no-merit briefs has increased, the time required to resolve a case has increased as well. Table 13 demonstrates this trend; it shows the number of days it takes for the Court of Appeals to render a decision in merit, no-merit, and all cases combined.

Table 13 - Length of Time for Court to Return Disposition After Receiving Final Brief

| Length of Time for Court to Return Disposition After Receiving Final Brief | | | | |
|---|---|---|---|---|
| | Year of Disposition | Number of Days from Final Brief Filed to Opinion Date | | |
| | | Merit Briefs | No-Merit Briefs | Total |
| Court of Appeals Dispositions | 2002 | 252 | 219 | 231 |
| | 2003 | 267 | 251 | 256 |
| | 2004 | 233 | 194 | 201 |
| | 2005 | 228 | 198 | 204 |
| | 2006 | 167 | 198 | 188 |
| | 2007 | 180 | 373 | 321 |

Between 2002 and 2006, the average number of days it took the Court of Appeals to render a decision on a no-merit brief remained steady, and even decreased slightly. However, in 2007, the average number of days it took the Court of Appeals to render a decision on a no-merit brief increased by 70%, from 219 days to 373 days. From 2002 to 2007, the average time required to render a decision on merit briefs declined from 252 days to 180 days. These numbers seem to indicate that the court staff attorneys are spending extra time and effort on the no-merit briefs, increasing their workload and delaying the appellate process.

Addressing Performance Problems

While there was some recognition at our first site visit that some longtime Appellate Division employees appeared to be under-performing, it was suggested that because they are all state employees protected by a grievance process, any terminations or demotions would be extremely difficult. While this may or may not be the case, the fact that the office lacks performance standards, regular evaluations, and administrative oversight certainly would contribute to any such difficulty.[29] We do not intend to suggest that based on our review of the office and limited interviews with staff - which did not include in-depth investigation into any one person's job performance - the Chief Appellate Defender should be taking action to terminate or demote such persons. Nonetheless, performance problems should be addressed with individual employees in some fashion (e.g. documentation, performance review, and possible admonition).

---

co-defendants at plea and sentencing and failed to disclose the fact that one of the co-defendants was his brother-in-law. In further evidence of an apparent conflict, the brother-in-law client received a significantly lesser sentence than the appellant as part of a package plea deal.

[29] We were told that the Chief Appellate Defender and the full-time Administrative Coordinator will be conducting performance evaluations of the entire office staff in the near future.

**Role of Appellate Division in the South Carolina Criminal Justice System**

Most people we interviewed described the overall reputation of the Appellate Division and its attorneys positively. At the same time, they all voiced concerns that the Appellate Division is overwhelmed with cases and lacks sufficient resources to handle them. Some commented that the office has always been understaffed.

Beyond the handling of appellate cases, however, the Appellate Division does not appear to have significant contact with other criminal law practitioners in South Carolina in terms of providing information and advice with the exception of one capital attorney. We were told that one capital appellate defender in the office presents a presentation on preserving a case for appeal and presents at the PD conference annual program and also California State Bar CLEs. In our experience, statewide appellate defender offices, in addition to providing direct representation, normally serve as a resource to criminal practitioners across the state seeking knowledge, advice and assistance not only on appellate practice, but also on criminal law generally. The appellate defenders are often the attorneys in the state who have the greatest knowledge of the most current court rulings and statutory law and are therefore a valuable resource to other attorneys, especially those handling criminal trials who often do not have the same resources and office time to remain abreast of new law and innovative arguments.

31

## Chapter 2: Systemic Issues

**Appeals of Guilty Pleas**

Currently, defendants who plead guilty may appeal their guilty pleas on direct appeal, and then file for relief under the Uniform Post-Conviction Procedure Act. *See* S.C. Code § 17-27-20. If defendants are denied relief at this stage, they may still file an appeal of the denial of post-conviction relief. *See* S.C. Code § 17-27-100. A defendant, then, may have a claim briefed twice by the Appellate Division and heard twice by the appellate courts – once on direct appeal and once on appeal from the post-conviction claim.

As previously mentioned, the Appellate Division reports that direct appeals of facially valid guilty pleas comprise 49% of the Appellate Division's direct appeals caseload.[30] Criminal defendants have a right to appeal their guilty pleas. *See* S.C. Code § 14-8-200. However, for a facially valid guilty plea, the record on direct appeal will usually be insufficient to demonstrate why the defendant's plea should be vacated.[31] Whether the claim is ineffective assistance of counsel or lack of voluntariness on the part of the defendant, a more in-depth record will need to be developed before any court, trial court or an appellate court, can make a determination regarding whether the plea should be vacated in all but the rarest cases. Under these circumstances, direct appeals will not be able to provide the relief sought by the defendant, because the factual basis for the claim will not be part of the record. As further discussed in Chapter 2 of this report, due to the large number of facially valid guilty pleas on direct appeal, and the subsequent large number of *Anders* briefs filed as a result, the Chief Appellate Defender in June 2006 requested procedural relief from the appellate courts.[32]

In considering the direct appeals of facially valid guilty pleas in South Carolina, TSG conducted additional research regarding such appeals in five other states for comparison: North Carolina, Oklahoma, Maryland, Kentucky, and Georgia. These states do not appear to be burdened with the direct appeals of facially valid guilty pleas in the way that South Carolina's system is burdened.

<u>North Carolina</u>

In North Carolina, only certain issues may be appealed as of right. *See* N.C. Gen. Stat. § 15A-1444. Otherwise, the defendant must apply for certiorari to seek permission to appeal. The primary mechanisms to challenge a guilty plea in North Carolina are a motion to withdraw the guilty plea or a motion for appropriate relief, both of which are ordinarily filed by trial counsel who represented the defendant at the plea.

---

[30] This number is from the Appellate Division data from May 1, 2007, through January 4, 2008, based on transcripts received from the court reporters.
[31] South Carolina Judicial Department, Appellate Court Rule 210(c) states that "The Record [on Appeal] shall not...include matter which was not presented to the lower court or tribunal." Rule 210(h) further clarifies that except as otherwise allowed by the rules, "the appellate court will not consider any fact which does not appear in the Record on Appeal."
[32] *State v. Thrift, supra.*

Oklahoma

In Oklahoma, direct appeals of guilty pleas are discretionary rather than mandatory. *See* Okla. Stat. tit. 22, § 1051. Accordingly, the general practice there seems to be to file a motion to withdraw a plea first, which triggers a mandatory right to appeal the denial of the motion to withdraw the guilty plea. If a defendant wishes to file a direct appeal, however, there is a right to counsel and the General Appeals Division is assigned. According to the appellate attorney with whom we spoke, office policy is to not file *Anders* briefs. They find an issue, brief it, and then the discretionary appeal is usually not accepted. However, going forward on direct appeal seemed to be the exception rather than the rule. That office does not appear to be overwhelmed with appeals of guilty pleas as a result of this policy. This may be, in part, because people do sometimes waive their right to appeal a guilty plea.

Maryland

Like Oklahoma, Maryland does not provide an automatic right to appeal a guilty plea, and often the right to appeal is waived as part of the plea agreement. *See* Md. Code art. 12, § 302(e). In order to appeal, an attorney must file an application for leave to appeal. The procedure in Maryland, if there is a deficiency in advice or the person did not receive the sentence promised, for example, is to file an immediate leave to appeal because there is a 30-day deadline to do so, even though the issues may not be on the record. Then, while that appeal is pending, the defendant files for post-conviction relief. The post-conviction hearing is held first, and then once the attorney obtains the transcript, they request the right to supplement the appellate record. This course of action allows defendants to have a hearing on the issues that may not be on the record, but keep the appeal on track as well. It also means that on the issue, there is only one appeal, rather than the potential for two.

Kentucky

In Kentucky, one appeal is allowed to every defendant as a matter of right. *See* Ky. Const., § 115; Ky. Rev. Stat. § 22A.020. The appellate branch of the public defenders office reports that guilty pleas usually involve a waiver of the right to appeal. As a result, it is very rare for a defendant to file a direct appeal of a guilty plea, and that office did not report a problem with receiving direct appeals of guilty pleas. A defendant who alleges that his guilty plea was involuntary or the result of the ineffective assistance of counsel must go through the post-conviction process.

Georgia

In Georgia, a defendant has the right to appeal a guilty plea (*see* Ga. Code Ann. § 5-6-33), but the appeal is an application to be heard by the appellate court. Essentially, the defendant must file a brief explaining the issue that the appellate court should address. This process appears to be from case law rather than any statutory construct. Appeals from facially valid guilty pleas are usually dismissed on their face, and there are relatively few opinions on guilty pleas. In Georgia, trial counsel is most often the attorney filing the appeal, and there is no statewide office taking the majority of the appeals. The burden of appeals from guilty pleas is on

33

the defense attorneys and not the courts which normally dismiss these appeals. Another option
for the defendant is to file a motion to withdraw a guilty plea, which must be done prior to the
end of the court's term. This method is the preferred vehicle to expand the record, and a denial
of the motion to withdraw may be appealed.

**Delays in the Appellate Process in South Carolina**

Notification of Appeal

A trial court attorney must file a NOI within ten days of conviction in the lower court and
the appellate court. The appellate court then notifies the Appellate Division of the case, although
this notification does not necessarily include a copy of the actual NOI. Further, there appears to
be some delay in this notification to the Appellate Division. The Court of Appeals is reportedly
late in notifying the Appellate Division of some appeals – on the day of or even after the
transcript request is due – and is no longer sending case memos to the division. Although there
is also some delay from the Supreme Court, the Court reportedly measures the 30-day deadline
for ordering the transcript from the date of notification to the Appellate Division.

Indigency Determinations

Currently, two people in the Appellate Division open the over one thousand cases that are
assigned to the Appellate Division each year. As part of this process, they must ensure that the
person is indigent and eligible for services because the current statutory scheme places the
obligation of determining eligibility and notifying the courts and defendant of that determination
on the Appellate Division.[33]

If the indigency status of a new appellant is unknown, the Appellate Division asks the
trial attorney to send the Order or Letter of Appointment or Affidavit of Indigency and signed
Order of Indigency (if previously represented by court-appointed counsel) or an Affidavit of
Indigency from the defendant (if previously represented by retained counsel). The Appellate
Division gives the trial court attorney a deadline for sending them the necessary information. If
counsel was retained below, the Appellate Division must take the additional steps of making the
determination of indigency after they receive the Affidavit and then notifying the court and the
defendant. This process is inefficient and can lead to unnecessary delay.

Incomplete Transcripts

The Appellate Division cannot easily ascertain what transcripts need to be ordered or if
they are missing transcripts from any hearings. Appellate Court Rule 203(d)(1)(B) only requires
that proof of service, copies of orders or judgments, if any, and filing fees accompany the NOI.
In a 1997 Order from Chief Justice Finney, the South Carolina Supreme Court also requires

---

[33] S.C. Code § 17-3-360(C)(1) states "A person desiring representation by the division shall request a determination
of his indigency status in writing from the Supreme Court, the court of appeals, the circuit or family court, or the
division. A court receiving a request for indigent appellate representation shall forward the request to the office who,
within ten days of the receipt of the request for representation, shall notify the person requesting representation and
the court in which the appeal will be effected of its decision." *Id.*

"counsel representing an indigent eligible for representation by the Office of the Appellate Defense" to provide a list of all trials and hearings held in the matter, indicating the dates, county, presiding judge, court reporter, and a brief description of each. Until this is completed, counsel may not be relieved from representing the defendant. Unfortunately, it appears from the letters sent out by the Appellate Division that trial counsel does not always comply with this order.

In order for the Appellate Division to obtain all of the transcripts, they must know all of the relevant dates in the case. In order to complete the appeal, they also may require copies of motions filed with the court by either party, along with voir dire requests and requests to charge. The trial courts should maintain all of this information.

In death penalty cases, the trial court clerks are already required by statute and court rule to obtain the transcript and maintain the entire record for appeal. Under S.C. Code § 16-3-25, whenever the death penalty is imposed, "[t]he clerk of the trial court, within ten days of receiving the transcript, shall transmit the entire record and transcript to the Supreme Court of South Carolina together with a notice prepared by the clerk and a report prepared by the trial judge." Additionally, pursuant to Rule 602(g)(5), once the record is generated and sent to the Supreme Court, "copies of the transcript will be provided to defendant's counsel."

This means there should already be a system in place in the trial courts so that the clerk can obtain all transcripts and keep an accurate account of the entire record in all death penalty cases, whether the death penalty was imposed or not. In order to obtain all of the transcripts and transmit the entire record, the trial courts should already have a mechanism for keeping track of every date in which the case was heard, the presiding judge, the clerk, and the court reporter. This system should be extended, if it is not already, to every case heard in that court. Trial counsel would then be in a position to provide all of the relevant court dates for appeal by reviewing the court's docket sheet.

Conflicts of Interest

There are also delays associated with late withdrawals due to late conflict of interest determinations. Generally, there are two reasons that an attorney at the Appellate Division would need to withdraw due to a conflict of interest. First, if the defendant asserts ineffective assistance of appellate counsel in his request for post-conviction relief, and that appellate counsel is or was an attorney at the Appellate Division, then there is a conflict of interest.[34] Second, if the defendant asserts ineffective assistance of trial counsel, and that attorney works for the Appellate Division, then there is also a conflict of interest.[35]

---

[34] See Carter v. State, 293 S.C. 528 (1987) (defendant was not barred from bringing a successive PCR claim of ineffective assistance of counsel where defendant was represented by trial counsel at the first PCR proceeding - trial counsel could not be expected to raise his own ineffectiveness); see also S.C. Code Appellate Court Rules, Rule 407, Rule 1.7(a)(2) (conflict of interest exists if there is a significant risk that the representation of a client will be materially limited by a personal interest of the lawyer).

[35] See S.C. Code Appellate Court Rules, Rule 407, Rule 1.7(a)(2).

A standardized conflict resolution procedure would allow the Appellate Division to quickly determine whether a conflict exists and if the office needs to withdraw. When a case is sent on direct appeal to the Appellate Division, the trial court attorney's name should be documented in the Notice of Appeal. If the trial court attorney works for the Appellate Division, a conflict determination should be made immediately, prior to obtaining the transcript. It appears that the Appellate Division has all of the information necessary to do a quick conflict check if this is the case.

If the case is an appeal of the denial of post-conviction relief, the Appellate Division needs to determine quickly if the request for post-conviction relief was predicated, even in part, on the ineffective assistance of counsel and the names of the counsel alleged to be ineffective. If possible, the Appellate Division should not wait until the transcripts have arrived to make this determination. One possible mechanism for identifying potential conflicts for PCR appeals is to determine if the client has been previously represented by the Appellate Division.

Unfortunately, this alone will usually be inadequate because without the transcript there is no way of knowing if ineffective assistance of counsel was an issue and which attorneys were alleged to be ineffective. It could be the trial court attorney only, or the appellate attorney, or both. One option is to require that the NOI of PCR claims include the names of any counsel, whether trial or appellate, alleged to be ineffective, if that is one of the issues raised at the PCR hearing. A standardized court form would be helpful to remind all counsel of the need to provide this information. In fact, a standardized form for a NOI on direct appeals would be helpful as well.

**Post-Conviction Relief Claims**

Many people with whom we spoke expressed some concerns regarding the current procedure in South Carolina for litigating post-conviction relief claims. While a full discussion and analysis of such systemic problems is beyond the scope of this report, we briefly describe below a few issues in the hope that it may initiate a dialogue among the stakeholders in the system regarding the concerns and potential ways to address them.

The PCR statute in South Carolina establishes a right to file for relief from a "trial or plea" and further provides for a right to counsel in the PCR proceeding.[36] We were told that while most PCR petitions are initially filed pro se, most petitions do result in a PCR hearing after an attorney is appointed by the Clerk of the County Circuit Court. However, because PCR proceedings are considered civil in nature, attorneys without any criminal law experience may be appointed to represent a defendant in a PCR trial.[37] Under Rule 608(c)(1)(A), in order to be on the list for appointment in criminal matters in a county, an attorney must have at least a minimal background in criminal law by representing "at least three (3) clients before the court of general sessions during a calendar year." The civil list, on the other hand, consists of "all other active members eligible for appointment in the county." As a result, many attorneys who have little to no experience in criminal law or trials are nonetheless appointed to PCR matters in which they are charged with the criminal trial transcript, spotting issues and litigating any post-conviction

---

[36] *See* S.C. Code § 17-27-60.
[37] *See* S.C. Appellate Court Rule 71.1(c).

claims. This not only jeopardizes the rights of the defendant, but also likely increases the number of no-merit appeals being filed on PCR claims.

Another concern raised by several people is that the PCR hearing system is inefficient and burdensome. We were told that PCR hearings are held one week every two months, but are frequently continued up to five times, causing a delay of ten months before a case is heard. Many attorneys are reportedly requesting multiple continuances of the PCR hearing, but are waiting until the time of the hearings to make the requests. We were told that these continuances are often due to the failure of the attorneys to meet with their clients in advance. Such last-minute delays waste time and resources of the courts, attorneys, witnesses and the sheriffs who must transport the defendants to each hearing.

We understand that there have been discussions of creating a separate PCR trial division under SCCID to handle all PCR hearings. We support such a move, which would help to address at least two of the aforementioned concerns surrounding PCR procedure. First, a PCR trial division would help to ensure adequate representation at the PCR hearing by employing experienced attorneys who are knowledgeable in criminal law and able to effectively advise a client as to any potential claims arising from a criminal case, as opposed to those attorneys across the state who are appointed from the civil lists. Second, having staff attorneys in such an office would likely help to reduce the number of continuances requested since such attorneys would be devoted full-time to the work and more available for court and client meetings.

**South Carolina Rules of Professional Conduct Rule 1.10(e)**

While not within the immediate scope of this study, we discuss here a serious concern that arose during the course of our work. South Carolina Rules of Professional Conduct Rule 1.10 discusses the imputation of a conflict of interest to a firm – that is, when an entire firm is considered to have a conflict of interest based on current or prior representation of a client by one of the attorneys at that firm. Specifically, Rule 1.10(a) states that all of the lawyers in a firm are prohibited from representing a client when any one of the lawyers in that firm, "practicing alone would be prohibited from doing so by Rules 1.7, 1.8(c), or 1.9, unless the prohibition is based on a personal interest of the prohibited lawyer and does not present a significant risk of materially limiting the representation of the client by the remaining lawyers in the firm." This rule is almost identical to Model Rule 1.10(a), promulgated by the ABA. South Carolina and the ABA rules both define the term "firm" to include "lawyers employed in a legal services organization."

However, South Carolina Rule 1.10(e) then effectively exempts programs providing legal services to indigent clients from providing conflict–free representation to co-defendants. South Carolina Rule 1.10(e), for which the ABA Model Rules provide no analog, states that "[a] lawyer representing a client of a public defender office, legal services association, or similar program serving indigent clients shall not be disqualified under this Rule because of the program's representation of another client in the same or a substantially related matter" as long as the lawyer is screened from confidential information relating to the other client, the lawyer does not participate in representation of the other client, and the lawyer retains professional independence in the matter.

37

ABA Model Rule 1.7(a)(1) and South Carolina Rule 1.7(a)(1) both state a conflict of interest exists if the representation of one client will be directly adverse to another client. ABA and South Carolina Rules 1.7(a)(2) further state that a conflict exists if "there is a significant risk that the representation of one or more clients will be materially limited by the lawyer's responsibilities to another client, a former client or a third person or by a personal interest of the lawyer." Except as provided for in 1.7(b), a lawyer shall not represent a client if a conflict of interest exists.

In a criminal case, co-defendants are likely to have directly adverse interests, and effective representation of one client in most cases will be hampered by the concurrent representation of a co-defendant. For instance, an offer of leniency for one co-defendant to testify or to provide information against another co-defendant may be made, one co-defendant may be more culpable than the other and wish to use that fact in plea bargaining, or the co-defendants may have differing accounts of what occurred, to name just a few examples. Indeed, both the ABA and South Carolina recognize in their comments to Rule 1.7 that "[t]he potential for conflict of interest in representing multiple defendants in a criminal case is so grave that ordinarily a lawyer should decline to represent more than one co-defendant."

While the comments to Rule 1.10(e) indicate that the rule was designed to "increase the number of persons to whom each program can provide legal services" – and it certainly increases cost efficiency – the conflict of interest does not disappear by virtue of the rule. Further, such a rule raises a concern regarding the Sixth Amendment and effective assistance of counsel.[38]

---

[38] *See Holloway v. Arkansas*, 435 U.S. 475 (1978) (the "assistance of counsel" guaranteed by the Sixth Amendment contemplates that such assistance be untrammeled and unimpaired by a court order requiring that one lawyer should simultaneously represent conflicting interests).

# Chapter 3: Findings and Recommendations

**Appellate Division Office**

1. The Appellate Division is largely staffed with experienced attorneys and generally maintains a positive reputation in the South Carolina criminal justice community. Despite this reputation, the office is struggling to provide adequate representation under crushing caseloads and systemic problems that have existed for some time. While a number of administrative and oversight issues should be addressed within the office, we do not believe that the critical issues regarding the adequacy of appellate representation of indigent persons in South Carolina can be solved without a significant reduction in the workload of the Appellate Division's attorneys, either by an increase in staffing and/or changes in the state's appellate system.

2. A somewhat reluctant administrator, and carrying a full caseload including capital appeals, the Chief Appellate Defender's main focus appears to be on handling cases. The Chief Appellate Defender reacts to administrative and personnel matters when necessary, but does not actively seek to address them before they arise. Greater administrative oversight and proactive measures are needed, such as those described below. Ideally, the Chief should also be working to effectuate reform in the South Carolina appellate system. In order to be a proactive administrator and leader, the Chief Appellate Defender's caseload must be significantly reduced. Similarly, the position of Deputy Chief Appellate Defender should involve some administrative, training and/or supervisory functions beyond the handling of cases.

3. The Appellate Division should create a written personnel manual and performance standards for all staff. A personnel manual for the office should set forth written policies and standards regarding various employment topics such as a code of conduct, office hours, limitations on outside employment, hiring and firing procedures, job descriptions, minimum job qualifications, and leave policies. Such a manual would set forth uniform standards of employment and put all staff on notice of the standards and expectations. Similarly, performance standards clearly set forth minimum requirements and expectations regarding staff performance; they are key to addressing performance problems and taking disciplinary action against employees.

   a. With regard to formal job descriptions, the allocation of responsibilities and tasks among SCCID and Appellate Division administrative support positions should be made clear in order to resolve confusion and increase efficiency.

   b. With regard to attorney staff, the Chief Appellate Defender should specifically establish performance standards in accordance with the rules and procedures of the South Carolina appellate courts and rules of professional conduct. Such standards should also create best practices for the office. These standards or policies should cover topics such as caseload standards, procedures for addressing overload, client contact, requests for extension, conflict determinations, transcript and record review, brief format and no-merit versus merit filings.

4. The Appellate Division needs formal training, supervision and evaluations for attorneys and support staff.

    a. Training and supervision can greatly improve the quality of representation provided to clients and is important to old and new attorneys as well as support staff in the office. For example, new attorneys should be formally trained in appellate practice and procedure and should be assigned an experienced attorney who is willing to act as a mentor. All attorneys, especially those new to the office, should have their substantive merit briefs reviewed by another attorney and should be mooting significant oral arguments. The office should also provide periodic in-house training on various topical issues for all attorney staff.

    b. Support staff should receive training on writing legal citations and editing legal briefs.

    c. All employees should receive performance evaluations, at least annually.

5. The Appellate Division needs greater administrative oversight of staff which should largely be performed by the Chief Appellate Defender and the full-time Administrative Coordinator. Despite some personnel (e.g., allocation of work and office hours of some support staff) or performance issues (e.g., attorney performance discussion) existing or reoccurring over time, little oversight or action appears to take place until or unless a complaint is made. Such problems should be addressed with individual staff and may include documentation, performance review, and possible admonition.

6. An overall lack of communication and cohesiveness among the Appellate Division staff contribute to general feelings of isolation and low morale. The Chief Appellate Defender and the full-time Administrative Coordinator should attempt to improve the situation by first instituting regular (a) office-wide meetings, (b) attorney meetings, and (c) support staff meetings. Such meetings should be held to address any number of issues that affect the staff, from personnel and administrative matters to general changes in court or office policy, practice or procedure. In addition, the Chief Appellate Defender should convene regular case conferences for all appellate defenders to discuss cases, brainstorm strategies, receive feedback from colleagues, and generally create a greater atmosphere of camaraderie.

7. The Appellate Division should create a brief bank to allow attorneys greater access to examples of other briefs. Brief banks are used by attorneys in both public and private firms as an invaluable resource to model briefs and arguments on particular legal issues such that attorneys do not need to "reinvent the wheel" when another attorney in the firm has previously dealt with the same or a similar issue. Currently, although the appellate defenders can access each other's work, they need to know the name of another attorney's client in order to locate a sample brief. A brief bank should organize briefs by topic to make them easily accessible. While an appellate defender should be tasked with

maintaining the bank, once created, attorneys should be able to add sample briefs as needed.

8. The Appellate Division does not utilize clear standards for determining entry level salaries for administrative or attorney staff. In addition, the staff of the Appellate Division have not received raises in over four years. The Chief Appellate Defender should create a more transparent and formal procedure regarding salaries. This procedure should include clear, written guidelines with salary ranges for entry level attorneys and administrative staff that reflect the experience level and the duties associated with the position. For current staff, the Chief Appellate Defender along with other supervisors should conduct regular performance evaluations where raises should be a consideration. We were told that performance evaluations will be occurring in the near future.

Case Management System

9. The Appellate Division's case management system needs to either be upgraded to keep track of a few more essential elements of information or replaced altogether. In considering the options, the office should assess whether the current system can be adapted to make use of a planned document management system for the office.

10. The current case management system lacks a readily available reporting feature. The system is not sufficiently documented to readily understand what each of the data elements means, and therefore the reports provided with the system give users very little opportunity to produce meaningful reports. Whether the current system is improved or a new system is selected, access to readily available and meaningful reporting tools should be a priority. Moreover, the database should have separate fields for type of hearing (plea, trial, etc.), charges, and whether the Appellate Division is the respondent or the appellant. The "normal" case category should be further broken down into smaller sections, such as seriousness of offense or type of offense.

11. Recently, the Appellate Division reportedly began tracking the number of cases that involve the appeals of guilty pleas. This is a critical data component for the office's caseload, as described below, and should be maintained permanently. Further, the system should allow for the rare exclusion or separate tracking of appeals of guilty pleas that were not (arguably) facially valid.

Caseload/Workload

12. The Appellate Division needs to reduce the number of cases assigned to its attorneys each year. The office filed 965 briefs in 2007, and an experienced attorney carried an average of 242 open cases and filed an average of 100 briefs per year. In that same year, an average of approximately 100 new cases were assigned to each attorney. As a point of comparison, the NAC recommended that a full-time appellate defender working exclusively on criminal appeals handle no more than 25 cases per year. As a result of the excessive workload, the Appellate Division requested 2.7 extensions per brief and takes an average of 167 days to file a brief once the transcript is complete while 73% of the

41

briefs filed were still no-merit briefs. Even if the Court granted the relief requested in *Thrift*, the Appellate Division's caseload would still be inordinately high at 80 new cases per attorney per year.

13. A supervising attorney, rather than the support staff, should make case assignments. In making the determination regarding workload, the supervising attorney should look at a number of issues in addition to strict caseload numbers and number of pages in the transcript. Other relevant factors that increase an attorney's workload that the supervising attorney should consider include the complicated nature of the current caseload, the number of issues presented in those existing cases, and the number of oral arguments scheduled in the near future. In PCR appeals, the number of pages should include the pages in the original trial transcript as well as the PCR trial transcript.

14. The high per-attorney caseload further translates into significant workloads for support staff, who must perform a number of administrative tasks on each case. In addition to their regular duties, overload places an extra strain on support staff to do jobs they do not have the qualifications to do such as assigning cases to attorneys. One significant factor in the workload of support staff is the number of extensions being filed in virtually every case in the office. The Appellate Division attorneys are filing 2.7 extensions per brief which translates to over 2600 extension requests per year. Some support staff report filing 10 extensions per attorney each day.

Appellate Practice/Attorney Performance

15. The Appellate Division is overwhelmed with high caseloads. Attorneys simply do not have adequate time to spend on each of their cases. The number of no-merit briefs that need to be filed leaves them with little time to devote to those cases that have meritorious issues. They are struggling to adequately represent each client, often performing the minimum amount of work necessary to get by and meet deadlines, such as reading transcripts at the last minute and filing skeletal briefs. After seeking several extensions of time on nearly every case, the attorneys finally prepare the brief after almost six months when they know that no more extensions are available. By that time, they are working against the clock. Some are filing briefs with blatant typographical and grammatical errors, and some even fail to follow proper procedure.

   a. Ideally, appellate defenders should be reviewing each other's briefs prior to filing. In the absence of time to do so, the Appellate Division is in need of paralegal staff to review and help improve the quality of attorney's briefs. Paralegals could also assist in conducting research and responding to client correspondence.

   b. The Appellate Division should provide all attorneys with written rules and procedures for filing briefs, particularly those needing to be filed under the *White* and *King* cases. These may include a checklist to guide the staff on proper procedure.

c. The Appellate Division should also conform to a standardized brief format, including a Statement of Facts section. This uniformity would make the Appellate Division briefs easily recognizable to the courts and would help ensure that each attorney is filing a quality product. A standardized brief format could be accomplished by having a case management system that generates the initial brief format or use of a template.

16. In addition to the number of guilty-plea appeals, we believe that the high caseloads of the Appellate Division attorneys are a contributing factor to the prevalence of no-merit briefs being filed. Attorneys simply do not have the time to fully explore and brief the merits of all of potential arguments to be raised. In addition, attorneys are not always clear as to what constitutes an issue to be filed under *Anders* or *Johnson*. In reviewing some no-merit filings, especially those sent back by the court for further briefing, we found that some issues that were not "wholly frivolous" were nonetheless submitted in a no-merit brief. While we understand that attorneys' caseloads are high, nonetheless, as long as an appellate attorney is able to conceive of an issue for appeal that is not "wholly frivolous," zealous advocacy requires the attorney to raise the issue even if the attorney doubts the chance of success. We recommend that the Appellate Division discuss with the appellate courts and then with attorney staff what is required of them in determining whether to file a merit or a no-merit brief and create a clear, written policy regarding the same.

17. Burdensome caseloads undoubtedly hamper the attorneys' ability to have greater contact with their clients. Further, cost and time efficiencies prevent appellate defenders from traveling across the state to visit all clients in prison. Nonetheless, greater attorney-client contact should be both encouraged and required pursuant to office policy, which needs to be created and should reflect best practices and attorney's ethical obligations to clients. For instance:

a. After reading the transcript, an attorney should send a letter or visit the client to explain the issues that might be raised and to seek any input from the client. Providing an explanation to the client as to why some issues are being raised but not others should help to improve client satisfaction with the representation.

b. Ideally, all clients would get an in-person visit from their attorney. However, we recognize the limitations imposed by caseload and time as well as by the geography of the state, and we recommend that attorneys be encouraged to make greater efforts to visit non-capital clients who are housed nearby, especially those requiring particular attention.

c. While appellate defenders do not have the time to send substantive letters to all of their clients currently, it should become standard practice once their caseloads are reduced. Our understanding is that most clients are sent form letters or correspondence from a law clerk.

d. Phone calls from client calls should be routinely accepted.

43

e. For guilty plea appeals, attorneys should inform the client in writing if no issue exists and ask if the client still wishes to continue the appeal. If the client has an issue, but it is not supported in the record, attorneys should briefly explain the PCR procedure. Some clients appeal because they are told they have a right to appeal, not because they are dissatisfied with the result of their case. Others appeal because they want their sentences reviewed and, if informed that is not possible, may withdraw their appeal.

18. In the event that caseloads are reduced, the Appellate Division should endeavor to act as a statewide support system for lawyers practicing indigent defense in the state. In our experience, statewide appellate offices can provide invaluable resources to court-appointed counsel and public defender offices at the trial level. Ideally, the Appellate Division should provide trainings for public defenders and assigned counsel on various topics such as preserving issues for appeal as well as supply updates on recent United States Supreme Court and South Carolina appellate court decisions.

**Systemic Issues**

Appeals of Facially Valid Guilty Pleas

19. Appellate and judicial resources are being wasted on the direct appeals of facially valid guilty pleas in South Carolina to an extent that is unparalleled in other southeastern states. The Court or legislature should require that a defendant wishing to contest a facially valid guilty plea move directly for relief under the Uniform Post-Conviction Procedure Act. Doing so would reduce the caseload of the Appellate Division and eliminate redundancy in the appellate judicial docket. Currently, direct appeals of guilty pleas reportedly comprise 49% of the Appellate Division's direct appeals caseload, yet they are, with few exceptions, a futile effort that waste time and resources of both the Appellate Division and the appellate courts. While removing the option of a direct appeal, defendants could still file a motion in the trial court to withdraw a guilty plea or to reconsider a sentence prior to seeking post-conviction relief, and further appeal the denial of such a motion. We were told that the South Carolina Supreme Court recently proposed a rule change to require the appellant who is appealing a guilty plea to file a written explanation showing that there exists an appealable issue; if the appellant does not make that showing, then the appeal would be dismissed.
*Relevant law*: S.C. Code § 17-27-20, § 17-27-100 (defendants may file a direct appeal of a guilty plea and then file for post-conviction relief).
Proposed Rule 203(d)(1)(B)(iv)

Delays in the Appellate Process

20. Appeals are being delayed by incomplete transcripts and records. In order to remedy the problem, the trial courts should maintain a docket sheet that lists every date in which the case was heard, the presiding judge, the clerk, counsel for the defendant and for the state, pleadings filed, and all court reporter(s) in order to assist appellate review. Ideally, this information should be made available online. In capital cases, trial court clerks are

already required to obtain the transcript and maintain the entire record for appeal. However, in cases involving multiple hearings and court reporters, including some capital cases, transcripts of hearings may not be ordered because the Appellate Division is unaware of them.

In addition, Rule 203(d)(1)(B) should be amended to require the trial attorney to list in the NOI: the date, presiding judge, clerk, and court reporter for the trial and all other hearings. The trial court attorney should also be required to include the charging documents, a list of motions filed, including voir dire requests and requests to charge (filed by either party), and a list of exhibits entered during any hearing or trials. Should the lower court maintain a complete and accurate docket sheet, this information should be easy to ascertain from the court.

*Relevant statute, rule and order*:
- S.C. Code § 16-3-25 (whenever a death sentence is imposed, "[t]he clerk of the trial court, within ten days of receiving the transcript, shall transmit the entire record and transcript to the Supreme Court of South Carolina together with a notice prepared by the clerk and a report prepared by the trial judge")
- Rule 602(g)(5) (in capital cases, once the record is generated and sent to the Supreme Court, "copies of the transcript will be provided to defendant's counsel")
- Chief Justice Finney order of December 12, 1997 (within 10 days after service of notice of appeal, counsel "shall provide the Office of Appellate Defense with a list of all trials and hearings held in the matter," including dates, county, name of judge, name of court reporter, and brief description of trial or hearing)

21. Appeals are also delayed by late conflict determinations. The Court should amend Rule 227 to require the NOI for PCR cases to state whether ineffective assistance of counsel was at issue and, if so, include the names of any counsel alleged to be ineffective. In this regard, the Court could create a standard form for the NOI in which the attorney can indicate whether ineffective assistance of counsel is an issue and, if so, the name(s) of the attorney(s) alleged to be ineffective. This should allow for a much timelier determination of conflict by the Appellate Division should ineffectiveness of an appellate defender be claimed.

The Appellate Division also needs to draft a conflict policy and implement a standardized conflict resolution procedure that allows for the timely identification and resolution of conflicts.

22. The appellate process could be made more efficient through timely filing of certain paperwork.

   a. The appellate courts should be required to notify the Appellate Division of an NOI within a certain period of time, and the time for seeking a transcript should not begin to toll until the Appellate Division receives notification from the appellate court. A copy of the NOI and any accompanying memorandum with case information should also be sent to the Appellate Division with all new

45

appeals. (The Court of Appeals is reportedly late in notifying the Appellate Division of some appeals – on the day of or even after the transcript request is due – and is no longer sending case memos to the division).

b.   In addition, the Court should amend Rule 203(d)(1)(B) to require all defendants to file a copy of the Order of Appointment (if previously represented by court-appointed counsel) or Affidavit of Indigency with the original NOI. Until indigency is determined, the appellate process is delayed. Cases are not opened in the Appellate Division and transcripts are not ordered until indigency is established. By the automatic filing of the Order of Appointment or Affidavit of Indigency with the original appeal, any delay and additional effort on behalf of the Appellate Division to establish indigency could be avoided.

c.   On a related note, although the current statutory scheme places the obligation of determining eligibility on the Appellate Division (S.C. Code § 17-3-360(c)(1)), we generally advise against defense counsel making that determination as it at least raises an appearance of a conflict. Ideally, determinations of indigency should be made by the courts or some other impartial agency (e.g., pre-trial services).[39] Requiring the courts to determine eligibility for appellate counsel would be consistent with the current procedure in place in the trial courts where an officer of the court makes the eligibility determination and notifies the Office of the Public Defender if a person is indigent and requires representation.[40]

*Relevant rules*:
- Appellate Court Rule 602(e)(3) ("the Public Defender or appointed counsel shall assist in representing the accused in any manner necessary to properly perfect the appeal")
- Appellate Court Rule 602(e)(4) (retained counsel must represent the accused "in any manner necessary to properly establish the indigency of the accused")
- Appellate Court Rule 71.1 (requiring PCR counsel to "assist the applicant in obtaining representation by the Division of Appellate Defense..," if the appellant is indigent)
- Appellate Court Rule 602(b) (requiring the courts to determine indigency at the trial level)

---

[39] S.C. Code § 17-3-340(I)(8) states "[t]he commission shall approve and implement programs, services, rules, policies, procedures, regulations, and standards as may be necessary or advisable to fulfill the purposes and provisions of this article in the delivery of indigent services. This includes, but is not limited to, standards for…determining indigence and for assessing and collecting the costs of legal representation and related services." *Id.*
[40] *See* S.C. Appellate Court Rule 602(b).

### Conflict Representation

23. South Carolina Rules of Professional Conduct Rule 1.10(e) provides less conflict-free representation to public defender clients than to clients of private counsel, raising a concern regarding equal protection and the right to effective assistance of counsel. The rule should be reassessed, as public defender clients should have the same right to conflict-free representation as do clients of private counsel.

    *Relevant rules*:
    - ABA Model Rule and South Carolina Rule 1.7(a)(1) (a conflict of interest exists if the representation of one client will be directly adverse to another client)
    - ABA Model Rule and South Carolina Rule 1.7(a)(2) (a conflict exists if "there is a significant risk that the representation of one or more clients will be materially limited by the lawyer's responsibilities to another client, a former client or a third person or by a personal interest of the lawyer")

### Post-Conviction Relief

24. While the reform of the PCR procedures is beyond the scope of this report, we briefly raise the following issues for consideration:

    a. PCR proceedings should be considered criminal in nature such that the court-appointed attorneys handling the cases are required to have adequate experience in litigating criminal cases. (Rule 608(c)(1)(A))

    b. The scheduling of PCR hearings needs to be reassessed. We were told that PCR hearings are held one week every two months. Some attorneys are reportedly requesting four to five continuances, causing a delay of ten months before a case is heard. This may or may not be related to the quality and experience of the PCR attorney. Nonetheless, such delays are burdensome and costly for the courts, the parties, witnesses, and the sheriff's department who must transport the defendants to the hearings.

    c. We were told that a number of PCR cases are filed because defendants in South Carolina have no other mechanism to challenge or appeal their sentences. Should such a mechanism be affirmatively created, South Carolina could see a significant reduction in the number of PCR filings.

## Chapter 4: Conclusion

In closing, we would like to recognize South Carolina and its many actors including the Chief Justice of the Supreme Court, Supreme Court and Court of Appeals staff members, several current and former Chief Public Defenders, SCCID and its Executive Director, and the Appellate Division employees that have contributed to the advancements in the delivery of indigent defense in South Carolina. Indeed, South Carolina has come a long way in providing indigent defendants with effective counsel. We commend South Carolina for putting forth the effort and resources to adequately fund indigent defense and taking concrete steps to enhance the delivery of services.

The most significant reform of the indigent defense system in South Carolina was the enactment of the new South Carolina Commission on Indigent Defense (SCCID) in 2007. SCCID and its Executive Director have spent significant time over the past few months implementing numerous requirements of the Indigent Defense Act.

We are hopeful that this report on the Appellate Division will be of substantial value in addressing a number of systemic and office reforms set forth in this report.

# **Exhibit** B

| STATE OF SOUTH CAROLINA | COURT OF COMMON PLEAS |
|---|---|
| COUNTY OF EDGEFIELD | ELEVENTH JUDICIAL CIRCUIT |

| | |
|---|---|
| Bryan J. Phillips, | CA No.: 2013-CP-19-386 |
| Plaintiff, | |
| vs. | **ORDER** |
| State., | |
| Defendant. | |

## INTRODUCTION

This is a postconviction relief action brought by the Applicant, Bryan Phillips (Phillips), who is currently incarcerated in the South Carolina Department of Corrections under Orders of Commitment issuing from Edgefield County, South Carolina. The State produced for this Court all records concerning Phillips' convictions and sentences as well as a complete Transcript of Phillips' trial. On December 13, 2017, this Court held a hearing in this case at which both Phillips and the State were represented by counsel. Phillips, Phillips' appellate counsel, Lanelle C. Durant (Durant), and Phillips' trial counsel, Randall D. Williams (Williams), testified at the December 13, 2017 hearing.

This Court has reviewed all the records concerning Phillips' convictions and sentences as well as the Transcript of Phillips' trial and has considered all the testimony presented at the December 13, 2017 hearing. This review and consideration convinces this Court that Phillips convictions and sentences violate the Sixth Amendment to the U.S. Constitution because Williams gave Phillips such deficient representation at Phillips' trial that Phillips suffered prejudice. As explained more fully in the following sections of this Order, this Court grants Phillips' Application for postconviction relief and vacates Phillips' convictions and sentences.

# FACTS

## I.    Investigation of the alleged crimes

Four Chinese nationals, Ji Queng Chen, Li Ai Meng, Guang Xing Li, Guan Xin, Selina Li, and Winson Li, who spoke only Mandarin Chinese, reported that they were robbed in Johnston, South Carolina on August 14, 2008. These witnesses alleged that there were three individuals involved in the robbery, but they could not identify the alleged robbers.

An informant, Patrick Stevens (Stevens), reported to Investigator Roosevelt O. Young, III (Young) of the Edgefield County Sherriff's Department (ECSD) that Alvin Phillips, Phillips, and K.C. Langford (Langford) robbed the four Chinese nationals. Johnston Police Department (JPD) personnel detained Alvin Phillips and interrogated him, and Alvin Phillips gave a statement in which he implicated himself, Phillips, and Langford in the robbery of the Chinese nationals.

JPD personnel secured Arrest Warrants charging Phillips with criminal conspiracy, armed robbery, burglary in the first degree, and kidnapping. The Edgefield County Grand Jury true billed Indictments against Phillips that allege criminal conspiracy (2008-GS-19-718), armed robbery (2008-GS-19-723), burglary in the first degree (2010-GS-274), and kidnapping (2010-GS-19-277).

## II.    Pretrial

The government put Phillips and Langford on trial together. On May 17, 2010, the Court held a pretrial hearing to take up Motions to Dismiss on speedy trial grounds that had been filed by Phillips and Langford. The government presented several justifications for the delay in putting Phillips and Langford on trial. As its principal justification for the delay, the government argued the difficulty that it was having in securing a Chinese language interpreter. The government represented to the Court that South Carolina Court Administration had no certified Chinese interpreters.

On the first day of the trial of Phillips and Langford, September 7, 2010, the trial court entertained additional pretrial matters. Most importantly, the trial judge took up the issue of the qualifications of the Chinese interpreter. The Chinese interpreter engaged by the government was not certified by South Carolina Court Administration. After hearing testimony and explaining the proper role of the interpreter, the trial court qualified the Chinese interpreter under S.C. Code § 15-27-55. (Tr. pp. 140-142)[1] Williams made only a general objection to the interpreter's qualifications. (Tr. p. 138)

### III.    Trial and Appeal

The Chinese nationals were vitally important witnesses; only their testimony could establish the corpus delicti of the alleged offenses. At several points during cross-examination by defense counsel of the three Chinese nationals that testified at trial, Ji Quing Chen. Li Guan Xin, and Li Ai Ming, the Chinese interpreter engaged in conversations in Chinese with the witnesses that were not confined to the attorney's questions and the witnesses' answers to those questions. (Tr. pp. 188, 209, and 214-215) These extraneous conversations were so obvious that the trial judge admonished the Chinese interpreter three times that his translations had to be verbatim the questions and answers. (Tr. pp. 188, 209, and 214-215) Williams did not retain a defense Chinese interpreter to participate in the trial of Phillips and Langford.

In its case-in-chief, the government presented only the testimony of Alvin Phillips to show that Phillips and Langford participated in the alleged crimes. Defense counsel thoroughly and persuasively cross-examined Alvin Phillips. Defense counsel even presented in evidence a written statement signed by Alvin Phillips in which he stated that Phillips and Langford had no participation in the alleged crime. In the defense case, Williams called Young to testify. During his direct examination of Young, Williams elicited testimony about the double hearsay statement

[1] TR references are to the Transcript of the jury trial of Phillips and Langford.

of the informant Stevens that Alvin Phillips, Phillips, and Langford participated in the robbery of the four Chinese nationals. (Tr. pp. 368-393) The testimony of Young figured prominently in the government's closing argument. (Tr. pp. 477-479, 488, and 490)

The jury convicted Phillips on all counts. The trial judge sentenced Phillips to twenty years for kidnapping, twenty years for armed robbery, twenty years for burglary in the first degree and five years for criminal conspiracy with all sentences to run concurrently. Williams timely filed a Notice of Appeal, and Durant of the Appellate Division of the South Carolina Office of Indigent defense perfected the appeal. The South Carolina Supreme Court issued an unpublished opinion affirming Phillips' convictions and sentences. In footnote one of that opinion the Supreme Court observed that that S.C. Code § 15-27-155(B) "is the statute for interpreters in a civil case, not a criminal one." State v. Phillips, Memorandum Opinion No. 2012-MO-049 (2012), fn. 1.

## LAW

### I.    The test for ineffective assistance of counsel

A criminal defendant is guaranteed the right to effective assistance of counsel under the Sixth Amendment to the United States Constitution. U.S. Const. amend. VI; Strickland v. Washington, 466 U.S. 668, 104 S.Ct. 2052, 80 L.Ed.2d 674 (1984). Courts evaluate allegations of ineffective assistance of counsel using a two-pronged test. Cherry v. State, 300 S.C. 115, 117, 386 S.E.2d 624, 625 (1989) (citing Strickland, 466 U.S. at 668, 104 S.Ct. 2052). First, the applicant must demonstrate counsel's representation was deficient, which is measured by an objective standard of reasonableness. Strickland, 466 U.S. at 687-88, 104 S.Ct. 2052. "Under this prong, '[t]he proper measure of attorney performance remains simply reasonableness under prevailing professional norms.'" Cherry, 300 S.C. at 117,386 S.E.2d at 625 (quoting Strickland, 466 U.S. at 688, 104 S.Ct. 2052). Second, the applicant must demonstrate he was prejudiced by counsel's performance in such a manner that, but for counsel's error, there is a reasonable probability the

result of the proceedings would have been different. <u>Strickland,</u> 466 U.S. at 694, 104 S.Ct. 2052. "A reasonable probability is a probability sufficient to undermine confidence in the outcome of the trial." <u>Rutland v. State,</u> 415 S.C. 570, 577, 785 S.E.2d 350, 353 (2016) (citing <u>Strickland,</u> 466 U.S. at 694, 104 S.Ct. at 2068, 80 L.Ed.2d at 698).

## II.    Instances of deficient representation

### A.    The interpreter statute

As the Supreme Court observed in its memorandum opinion affirming Phillips' convictions and sentences, the trial court erroneously qualified the interpreter under the interpreter statute for civil cases, S.C. Code § 15-27-155, instead of the proper interpreter statute for criminal cases, S.C. Code § 17-1-50. <u>State v. Phillips,</u> Memorandum Opinion No. 2012-MO-049 (2012), fn. 1. Evidence was presented at the December 13, 2017 hearing that Williams had a copy of S.C. Code § 17-1-50 that he was referring to during Phillips' trial.

When the trial court announced its ruling qualifying the Chinese interpreter under the wrong statute, Williams made only a general objection as to qualifications. Durant testified at the December 13, 2017 hearing that this objection was much too general to preserve the issue of the proper statute to be used in qualifying an interpreter in a criminal case for appellate review. Williams' failure to preserve the issue of the proper statute for the qualification of an interpreter in a criminal case constitutes deficient representation.

### B.    Defense Chinese interpreter

On cross-examination at the December 13, 2018 hearing, Williams acknowledged that he knew as of the May 17, 2010 hearing that the government's Chinese interpreter would not be certified by South Carolina Court Administration. During the same cross-examination, he also admitted that the Chinese nationals were critical witnesses because only their testimony could establish the <u>corpus delicti</u> of the alleged crimes.

Williams also testified that an organization known as Foreign Translations with an office in Greenville, SC could have provided defense translation services and that Williams could have had access to South Carolina Commission on Indigent Defense funding for those services. Williams' failure to hire a defense Chinese interpreter was deficient representation when he knew that the government's interpreter would be uncertified and that the testimony of the Chinese nationals was critical to the case.

### C.    Calling Young as a witness

In presenting Young's testimony, Williams succeeded only in providing an additional connection between Phillips and the alleged crime when the only other connection, Alvin Phillips' testimony, had been weakened by cross-examination and by the introduction in evidence of Alvin Phillips' statement that Phillips and Langford had not participated in the alleged crime. The wound was entirely self-inflicted. The government could not have used Young's testimony about the statement of the informant, Stevens, because testimony by Young on that point would have been double hearsay. Young's testimony about Stevens' statement was allowed in evidence only because Williams' offered it.

At the December 13, 2017 hearing, Williams claimed that he called Young to testify about Stevens' statement as part of his trial strategy. Williams testified that he called Young to show that the early focus on Alvin Phillips originated in an ongoing informant and law enforcement relationship between Stevens and Young. This is not what Young testified to. Williams admitted that he did not interview Young about the circumstances of Stevens' statement before putting Young on the stand. Williams testified that he was acquainted with Young and that he could have spoken with Young before putting him on the stand. Williams' failure to speak with Young before putting him on the stand to testify about the double hearsay statements of the informant, Stevens, constitutes deficient performance.

## III.     Prejudice

### A.     The interpreter statute

There is a critical difference in the interpreter statutes. S.C. Code § 15-27-155 permits an interpreter that is an "instructors in a foreign language" or has a sufficient level of fluency in a particular foreign language "to interpret the foreign language of another person." On the other hand, S.C. Code § 17-1-50 requires that an interpreter be "readily able to interpret simultaneously and consecutively ... from English into the language of the non-English speaking person, or from the language of that person into spoken English." Because Williams failed to object to the qualification of the Chinese interpreter, there is a reasonable probability that the result of the proceedings against Phillips would have been different in that the interpreter qualified would have been demonstrably more qualified.

Durant testified at the December 13, 2017 hearing that she did not raise the interpreter statute issue in Phillips' appeal because the issue was undoubtedly not preserved for appellate review because of an insufficient objection. Durant further testified at that hearing that if the interpreter statute issue had been preserved for appellate review, she would have prominently placed it in her appellate brief as the first and most substantial issue on appeal. If Williams had made a sufficient objection on the interpreter statute issue, there is a reasonable probability that the result would have been different in that there is a reasonable probability that Phillips' convictions and sentences would have been reversed on appeal.

### B.     Defense Chinese interpreter

During the cross-examinations by defense counsel of the Chinese nationals who testified at trial, the government's Chinese interpreter engaged in conversations in Chinese with the testifying Chinese nationals that were not restricted to the questions and answers. (Tr. pp. 188, 209, and 214-215) In fact, the trial judge had to warn the government's Chinese interpreter three times to

confine his statements to the questions and answers. (Tr. pp. 188, 209, and 214-215)

To this day, only the government's Chinese interpreter and the Chinese nationals know for certain what the government's Chinese interpreter said to the testifying Chinese nationals in these extraneous comments. A defense Chinese interpreter would have ensured that the trial judge and all parties to the trial knew what the government's Chinese interpreter said to the testifying Chinese nationals in these comments. Phillips was prejudiced by Williams' failure to hire a defense Chinese interpreter. If Williams had hired such an interpreter, there is a reasonable probability that the result of the trial would have been different.

### C.    Calling Young as a witness

Young's testimony about his interaction with the informant, Stevens, was, without doubt, adverse to Phillips' case at trial. By calling Young as a witness and questioning him about these matters, Williams did harm to Phillips' case. Because of the double hearsay nature of Young's testimony about what Steven's told Young, the harm done to Phillips' case by Williams' calling and examination of Young was harm done by Williams to Phillips' case that could not have been done by the government alone. Young testified to the effect that Stevens was acting as a good citizen. This testimony and Young's testimony about Stevens' statement figured prominently in the government's closing argument. (Tr. pp. 477-479, 488, and 490) But for Williams' deficient representation in calling and examining Young, there is a reasonable probability that the result of Phillips' trial would have been different.

### CONCLUSION

Phillips has demonstrated that Williams gave him deficient representation and that each of the three instances of deficient representation prejudiced Phillips in the sense that there is a probability sufficient to undermine confidence in the outcome of Phillips' trial that, absent the deficient representation, the jury would have had a reasonable doubt respecting Phillips' guilt. For

these reasons this Court **GRANTS** Phillips' PCR Application and **VACATES** Phillips'

convictions and sentences.

**AND IT IS SO ORDERED!**

J. Cordell Maddox, Jr.
Presiding Circuit Court Judge

Anderson , SC
May 25 , 2018