IN THE SUPREME COURT OF THE UNITED STATES

March Term, 2013

———————————

No. A—

———————————

K.C. LANGFORD,

Petitioner,

v.

STATE OF SOUTH CAROLINA,

Respondent.

———————————————————

**A P P E N D I X**

———————————————————

ELIZABETH A. FRANKLIN-BEST
Blume Norris & Franklin-Best, LLC
900 Elmwood Avenue, Ste. 101
Columbia, South Carolina 29201
(803) 765-1044, Ext. 14
betsy@blumelaw.com

David Spencer
Assistant Attorney General
Rembert Dennis Building
1000 Assembly Street, Room 519
Columbia, South Carolina 29201

# THE STATE OF SOUTH CAROLINA
## In The Supreme Court

The State, Respondent,

v.

K.C. Langford, III, Appellant.

Appellate Case No. 2010-173128

———————————

Appeal From Edgefield County
William P. Keesley, Circuit Court Judge

———————————

Opinion No. 27195
Heard April 18, 2012 – Filed November 21, 2012

———————————

## AFFIRMED

———————————

Elizabeth Anne Franklin-Best, of South Carolina
Commission on Indigent Defense, of Columbia, for
Appellant.

Attorney General Alan McCrory Wilson, Chief Deputy
Attorney General John W. McIntosh, Senior Assistant
Deputy Attorney General Salley W. Elliott, Assistant
Deputy Attorney General David A. Spencer, all of
Columbia, and Solicitor Donald V. Myers, of Lexington,
for Respondent.

E. Charles Grose, Jr., of Greenwood, and Tara S. Waters,
of Laurens, for Amicus Curiae South Carolina Public
Defender Association.

A1

Solicitor David M. Pascoe, Jr., of Columbia, for Amicus
Curiae Solicitors' Association of South Carolina.

———————

**JUSTICE HEARN:** We must determine whether Section 1-7-330 of the South
Carolina Code (2005), which vests control of the criminal docket in the circuit
solicitor, violates the separation of powers principle embodied in Article 1, Section
8 of the South Carolina Constitution. In 1980, we recognized that "[t]he authority
of the court to grant continuances and to determine the order in which cases shall
be heard is derived from its power to hear and decide cases." *Williams v. Bordon's,
Inc.*, 274 S.C. 275, 279, 262 S.E.2d 881, 883 (1980). "This adjudicative power of
the court carries with it the inherent power to control the order of its business to
safeguard the rights of litigants." *Id.* The time has now come for us to
acknowledge that section 1-7-330 is at odds with this intrinsically judicial power.
We therefore hold that section 1-7-330 violates the separation of powers and
therefore is unconstitutional. However, because K.C. Langford, III, the Appellant
herein, suffered no prejudice as a result of section 1-7-330, we affirm his
convictions.

## FACTUAL/PROCEDURAL BACKGROUND

On August 14, 2008, Ji Quing Chen, along with his son, Li Guan Xin, and
wife, Li Ai Ming, left the Chinese restaurant they own in Johnston, South Carolina,
shortly after 10:00 p.m. and headed home. With them was a black bag containing
the day's earnings. When they arrived home, Ji Quing stayed outside to water
some plants while his wife and son entered the house. As he was tending to his
garden, three men wearing masks came out from the bushes, forced him to the
ground, hit him, and took his wallet. Concerned that his father had not yet come
inside, Li Guan stepped out onto the porch to check on him. Once he was outside,
the men forced Li Guan to the ground and asked where the restaurant's money was.
He told them it was in the house, and one of the men went inside to find it. That
man returned shortly with the black bag, and all three of them ran off. Because the
men wore masks, the victims were unable to provide a useful description to law
enforcement. Moreover, it does not appear the men left any forensic evidence
during the commission of these crimes.

Investigators eventually met with Alvin Phillips, who in a statement dated
September 28, 2008, confessed that he was one of the men who robbed the family.
He further identified his cousin and Langford as the two remaining suspects. In the
absence of an eye-witness identification and forensic evidence, Phillips' statement

A 2

was the only evidence implicating the other men. Langford was arrested shortly thereafter on October 3, and he was indicted for criminal conspiracy a few months later in December 2008. However, he was not indicted for armed robbery, first degree burglary, and kidnapping until May 5, 2010, nineteen months following his arrest. He would remain incarcerated until his trial.

The State attributed the delay in procuring these indictments to difficulties in finding Chinese interpreters to translate what Ji Quing and his family, none of whom spoke English well, were relaying to investigators. Furthermore, Phillips retracted his statement implicating Langford while the two of them were housed in the same detention facility. He did so first in a signed statement dated January 29, 2009. On March 31, 2009, he signed another statement wherein he attested that the original statement he made to police in September 2008 was not true and he was not in the "right state of mind" when he made it. According to the State, Langford and his co-defendant pressured Phillips into recanting. In fact, Phillips testified Langford even brought him these later statements to sign. To avoid further intimidation, Phillips was moved to another facility. At some point thereafter, although it is not clear when, Phillips again agreed to testify against Langford.

On June 29, 2009, nearly nine months after he was taken into custody, Langford made what appears to be a *pro se* motion for a speedy trial. A hearing was held on May 17, 2010, and Langford renewed his motion at that time and joined it with a motion to dismiss.[1] This was the date on which the State originally planned to try Langford and his co-defendant, with Phillips serving as a cooperating witness who would testify against them. But the State received word that morning that Phillips decided to invoke his privilege against self-incrimination and would not testify at the trial. Allegedly, this was due to pressure Langford and Phillips' cousin continued to exert on him even after his transfer. Phillips now would not be available for cross-examination at trial, and the State therefore could not use his prior statement implicating Langford.[2] Because the State's case against

---

[1] It does not appear the court ever ruled on Langford's ostensibly *pro se* motion prior to this hearing. Moreover, the record suggests that the hearing was held upon the motion of Langford's co-defendant, Phillips' cousin. This motion was styled as a motion to dismiss or, in the alternative, a motion for a speedy trial.

[2] *See Bruton v. United States*, 391 U.S. 123, 126 (1968) (holding the Confrontation Clause bars the admission of a statement of a co-defendant who remains silent which is to be used against the other defendant at trial).

A 3

Langford rested almost exclusively on Phillips' statement, without it the State effectively was prevented from going forward.

To remedy the situation, the State needed to try Phillips first or, presumably, obtain a guilty plea with the attendant waiver of his right to remain silent. However, Phillips had retained new counsel just eight days prior to the hearing who understandably was not ready to move forward during that term of court. The State therefore requested a continuance so it could proceed against Phillips at the next available opportunity, at which point it would then be able to try Langford. Although the court was "deeply concerned" by the twenty-month delay in the case, it found that "[n]one of this delay was occasioned by any impropriety on the part of the State." It also recognized that, for all intents and purposes, the State could not proceed in the absence of Phillips' testimony. The court accordingly denied Langford's motion to dismiss and granted the State a continuance. However, cognizant of the delays which had already accrued, the court ordered the State to try Langford within nine months, and it further directed that Langford could renew his motion at that time if the State failed to do so.[3]

Phillips pled guilty in August 2010 and once again agreed to testify for the State. Langford's case was then called for trial on September 7, 2010, nearly two years after his arrest.[4] The jury convicted Langford on all four charges, and the court sentenced him to twenty years' imprisonment on the armed robbery, kidnapping, and first degree burglary charges, and five years' imprisonment on the civil conspiracy charges, all to run concurrently. This appeal followed. After the appeal was perfected, the court of appeals granted permission for the South Carolina Public Defender Association to file an amicus curiae brief challenging the constitutionality of section 1-7-330. This case subsequently was certified to us pursuant to Rule 204(b), SCACR.

---

[3] The court would have set an earlier deadline, but there were scheduling conflicts with a pending death penalty trial and a visiting judge. Additionally, while Langford did file what seems to be another *pro se* motion to dismiss on May 25, 2010, it does not appear the court ruled on it.

[4] This was only the second General Sessions term of court for Edgefield County after May 17, 2010, the term in which the State received the continuance.

A 4

## ISSUES PRESENTED

I.    Is section 1-7-330 constitutional?

II.   Did Langford suffer any prejudice as a result of the solicitor controlling when his case would be called for trial?

## LAW/ANALYSIS

## I.    SECTION 1-7-330

We agree with the Public Defender Association that section 1-7-330 is unconstitutional. Before we reach the merits of this question, however, we must first address the State's position that it is not preserved for our review.

Constitutional questions must be preserved like any other issue on appeal. *In re McCracken*, 346 S.C. 87, 92, 551 S.E.2d 235, 238 (2001). As the State correctly notes, this issue was not raised to or ruled upon by the circuit court. *See Wilder Corp. v. Wilke*, 330 S.C. 71, 76, 497 S.E.2d 731, 733 (1998) (stating an issue must have been raised to and ruled upon to be preserved for review). Moreover, Langford's statements of the issue on appeal do not raise this question. *See* Rule 208(b)(1)(B), SCACR ("Ordinarily, no point will be considered which is not set forth in the statement of the issues on appeal."). Indeed, this issue is only before us by way of the amicus brief filed by the Public Defender Association, and our rules provide that an amicus brief "shall be limited to argument of the issues on appeal *as presented by the parties.*" Rule 213, SCACR (emphasis added).

Nevertheless, we previously have considered arguments raised only by an amicus when they concern a "matter of significant public interest." *Ex parte Brown*, 393 S.C. 214, 216, 711 S.E.2d 899, 900 (2011). We stress that this exception to Rule 213 must be applied narrowly and only under the appropriate circumstances so as not to eviscerate the long-standing preservation requirements in our jurisprudence. However, we have little trouble concluding that who decides when criminal defendants in this State should be tried is a matter of significant

A5

public interest as envisioned by *Brown*. [5]   We therefore proceed to analyze the constitutionality of section 1-7-330.

Section 1-7-330 states in full:

> The solicitors shall attend the courts of general sessions for their respective circuits.   Preparation of the dockets for general sessions courts shall be exclusively vested in the circuit solicitor and the solicitor shall determine the order in which cases on the docket are called for trial. *Provided,* however, that no later than seven days prior to the beginning of each term of general sessions court, the solicitor in each circuit shall prepare and publish a docket setting forth the cases to be called for trial during the term.

In reviewing the validity of this statute, we are reluctant to find it unconstitutional. *See In re Treatment and Care of Luckbaugh*, 351 S.C. 122, 134, 568 S.E.2d 338, 344 (2002).  We will therefore make every presumption in favor of its validity. *Id.* The party challenging the statute bears the heavy burden of proving that "its repugnance to the constitution is clear and beyond a reasonable doubt." *Id.* at 134-35, 568 S.E.2d at 344.

The Public Defender Association contends section 1-7-330 violates the separation of powers by impermissibly conferring judicial responsibilities upon a member of the executive branch.  Our constitution mandates that "the legislative, executive, and judicial powers of the government shall be forever separate and distinct from each other, and no person or persons exercising the functions of one of said departments shall assume or discharge the duties of any other." S.C. Const. art. I, § 8.

---

[5] We do not take lightly the dissent's concern that by addressing the merits of the Public Defender Association's argument we offend our rules of preservation, but remain convinced this issue falls easily within our exception.  Moreover, if the issue is truly unpreserved, as the dissent contends, we are at a loss to understand why the dissent addresses the merits.  Preservation in South Carolina is a threshold issue and if an issue is unpreserved, it is not properly before the court and the merits should not be reached.  *See State v. Roach*, 377 S.C. 2, 3, 659 S.E.2d 107, 107 (2008) (noting that issues not preserved for review should not be addressed); *State v. Dunbar*, 356 S.C. 138, 142, 587 S.E.2d 691, 694 (2003) (same).

A 6

> One of the prime reasons for separation of powers is the desirability of spreading out the authority for the operation of the government. It prevents the concentration of power in the hands of too few, and provides a system of checks and balances. The legislative department makes the laws; the executive department carries the laws into effect; and the judicial department interprets and declares the laws.

*State ex rel. McLeod v. McInnis*, 278 S.C. 307, 312, 295 S.E.2d 633, 636 (1982).

We begin by ascertaining where in our system of government solicitors fall. We note the only reference to solicitors in the constitution is in the article creating the judicial department. *See* S.C. Const. art. V, § 24. However, this section also provides that "[t]he General Assembly shall provide by law for their duties." *Id.* To that end, Section 1-1-110 of the South Carolina Code (2005) squarely places solicitors in the executive branch. Moreover, the Solicitors' Association of South Carolina unequivocally states in its own amicus brief defending section 1-7-330, "The Office of Solicitor is part of the Executive Branch of our state government." Accordingly, we conclude solicitors are members of the executive branch.

We must next determine whether vesting solicitors with the exclusive authority to prepare the dockets for General Sessions is an infringement on the court's powers. "[A] usurpation of powers exists, for purposes of [the] constitutional separation of powers doctrine, when there is a significant interference by one branch of government with the operations of another branch." 16A Am. Jur. 2d *Constitutional Law* § 246. This rule is not fixed and immutable, however, as there are grey areas which are "tolerated in complex areas of government." *McInnis*, 278 S.C. at 313, 295 S.E.2d at 636 (1982). There consequently is "some overlap of authority and some encroachment to a limited degree." *Id.*; *see also* 16A Am. Jur. 2d *Constitutional Law* § 244 ("Separation of powers does not require that the branches of government be hermetically sealed; the doctrine of separation requires a cooperative accommodation among the three branches of government; a rigid and inflexible classification of powers would render government unworkable."). At its core, the doctrine therefore "is directed only to those powers which belong exclusively to a single branch of government." 16A Am. Jur. 2d *Constitutional Law* § 246.

As we noted at the outset of this opinion, a court's power to hear and decide cases "carries with it the inherent power to control the order of its business." *Williams*, 274 S.C. at 279, 262 S.E.2d at 883. Setting the trial docket therefore is the prerogative of the court. Section 1-7-330, on the other hand, states,

A7

"Preparation of the dockets for general sessions courts shall be *exclusively vested in the circuit solicitor* and the solicitor shall determine the order in which cases on the docket are called for trial." (emphasis added). Vesting a member of the executive branch with the exclusive authority to perform an inherently judicial function unquestionably is a violation of separation of powers. *See Hagy v. Pruitt*, 331 S.C. 213, 222, 500 S.E.2d 168, 173 (Ct. App. 1998) (Howard, J., concurring) ("[A] statute which attempts to exercise ultimate authority over the inherent power of the court is unconstitutional because it violates the separation of powers doctrine . . . ."), *aff'd*, 339 S.C. 425, 529 S.E.2d 714 (2000). This is not a grey area where some encroachment can be tolerated, but rather a complete invasion into the court's domain.

The dissent, however, takes a different approach and contends that finding the statute unconstitutional will somehow permit courts to infringe upon the powers of the solicitor.[6] Nevertheless, the dissent correctly acknowledges that the discretion afforded the solicitor "does not mean that the solicitor's authority is unrestrained by judicial oversight. The trial judge has the ultimate authority to determine whether a case called by the solicitor will be tried at a particular juncture." Thus, it appears the dissent truly believes the court has always had the authority to control the docket. In light of that position, we are at a loss as to why it believes our holding today infringes on the solicitor's power.

In fact, we believe our holding is consistent with the dissent's support for the importance of judicial restraint on prosecutorial power. However, unlike the dissent, we recognize that by providing that the "[p]reparation of the dockets for general sessions courts shall be *exclusively vested in the circuit solicitor* and the *solicitor shall* determine the order in which cases on the docket are called for trial" (emphasis added), the plain and unambiguous language of section 1-7-330 cannot be squared with this oversight. The statute must therefore yield.

---

[6] Undoubtedly, the solicitor has discretion in choosing how to proceed with a case, including whether to prosecute in the first place and whether he brings it to trial or offers a plea bargain. True too is the fact that he must grapple with marshaling witnesses, ranging from victims, to police officers, to experts. Because the State bears the burden of proof, the solicitor also does not want to call the case before he himself is ready. Moreover, he is the person most knowledgeable about the status of the case. These are all truisms we cannot dispute, and they are prerogatives of the solicitor (and, to a large degree, of defense counsel as well) and are unaffected by our decision.

A8

Accordingly, we hold section 1-7-330 is unconstitutional beyond a reasonable doubt.

## II.    PREJUDICE

Our determination that section 1-7-330 violates separation of powers is not dispositive of Langford's appeal. To warrant reversal, Langford must demonstrate that he sustained prejudice as a result of the solicitor setting when his case was called for trial. As this case comes to us, two different forms of prejudice are alleged: (1) Langford was denied his right to due process because section 1-7-330 permitted the solicitor to judge shop, and (2) Langford was denied his right to a speedy trial. We disagree that Langford's trial suffered from any infirmities as a result of section 1-7-330 and therefore affirm his convictions.

### A. Due Process

We consider first whether the power impermissibly granted to the solicitor by section 1-7-330 enabled him to violate Langford's due process rights. Although many different violations are discussed anecdotally, the only due process violation said to have occurred in this case is that section 1-7-330 permitted the solicitor to select the judge who would preside over Langford's trial. Although we question the extent to which section 1-7-330 actually permitted judge shopping, we proceed assuming *arguendo* that it did so.

A criminal defendant has a due process right to have his case heard by a fair and impartial judge. *See Schweiker v. McClure*, 456 U.S. 188, 195 (1982) ("[D]ue process demands impartiality on the part of those who function in judicial or quasi-judicial capacities."). Similarly, he has the right to have a judge assigned to his case "in a manner free from bias or the desire to influence the outcome of the proceedings." *Cruz v. Abbate*, 812 F.2d 571, 574 (9th Cir. 1987) (Kozinksi, J.). On the other hand, he does not have a right to "any particular procedure for the selection of the judge." *Id.* Thus, there is no right to have one's judge selected randomly, nor is there one to have a case heard by any particular judge. *Sinito v. United States*, 750 F.2d 512, 515 (6th Cir. 1984). Moreover, a defendant has "no vested right in the order in which cases are assigned for trial." *Levine v. United States*, 182 F.2d 556, 559 (8th Cir. 1950).

Accordingly, a state may use any method to select judges so long as it is impartial and not geared towards influencing the trial's outcome. Without a doubt, permitting solicitors—who represent a party in the case—to select the judge raises

the specter of partiality and calls the validity of the entire system into question. *See United States v. Pearson*, 203 F.3d 1243, 1257 (10th Cir. 2000) ("In our view, if the assignment of a case to an individual judge should not be based on 'the desire to influence the outcome of the proceedings,' then allowing a prosecutor to perform that task raises substantial due process concerns." (quoting *Cruz*, 812 F.2d at 574)); *Tyson v. Trigg*, 50 F.3d 436, 442 (7th Cir. 1995) (Posner, J.) ("The practice of allowing the prosecutor to choose the . . . trial judge is certainly unsightly, as the Indiana court of appeals opined; it does lack the appearance of impartiality . . . ."); *Cruz*, 812 F.2d at 574 ("The suggestion that the case assignment process is being manipulated for motives other than the efficient administration of justice casts a very long shadow, touching the entire criminal justice system . . . ."). Some courts have therefore struck down their systems of permitting prosecutors to select judges. *State v. Simpson*, 551 So. 2d 1303, 1304 (La. 1989) (doing so on due process grounds); *McDonald v. Goodstein*, 83 N.Y.S.2d 620, 625 (Sup. Ct. 1948) (holding that granting prosecutors control over choosing the judge threatens the independence of the judiciary); *see also Rosemond v. Catoe*, 383 S.C. 320, 326 n.1, 680 S.E.2d 5, 8 n.1 (2009) ("We acknowledge the practice of the prosecutor selecting the trial judge is inappropriate and troubling.").

However, as Judge Posner wrote, "[t]he presumption that judges are unbiased is more than a pious hope." *Tyson*, 50 F.3d at 439. Furthermore, "[t]he right to a judge who is free from the mere *appearance* of partiality is not part of due process at all." *Id.* at 442. Hence, we will not presume the judge is partial simply because he was selected by the prosecutor, for adopting such a rule would "conflate[] the appearance of partiality with actual partiality." *Francolino v. Kuhlman*, 224 F. Supp. 2d 615, 636 (S.D.N.Y. 2002), *aff'd*, 365 F.3d 137 (2d Cir. 2004); *see also Pearson*, 203 F.3d at 1262 ("[W]e cannot presume that a federal judge selected by the prosecutor will be his agent or henchman."). In order to be entitled to relief, a defendant therefore must establish actual partiality and prejudice on the part of the judge. *Pearson*, 203 F.3d at 1263 (finding prosecutorial selection of judge harmless error because there was no evidence the judge decided any issue in a manner more favorable to the prosecution than other judges would have); *Tyson*, 50 F.3d at 442 (holding permitting the prosecutor to choose the judge "does lack the appearance of impartiality[,] but that is all, so far as the record of this case discloses, and it is not enough"); *Sinito*, 750 F.2d at 515 ("Even when there is an error in the process by which the trial judge is selected . . . the defendant is not denied due process as a result of the error unless he can point to some resulting prejudice."); *Francolino*, 224 F. Supp. 2d at 636 ("While the Court agrees that the former system gave the appearance of partiality, maintaining that Justice

A 10

Snyder was in fact partial is a separate matter."); *State v. Huls*, 676 So. 2d 160, 167 (La. Ct. App. 1996) (noting a showing of prejudice was required even after the Louisiana Supreme Court struck down the practice of prosecutorial selection of judges on due process grounds).

The only support offered for the allegation of bias by the presiding judge in this case, Judge Keesley, is the simple fact that he ruled in favor of the State on previous issues that arose. Yet, there is not a shred of evidence that he did so out of any animus towards Langford or allegiance to the State. The contention that a judge was biased *solely* because he ruled against a defendant is untenable and insulting towards the court, and it would set a dangerous precedent were we to sanction it. Moreover, Judge Keesley ordered in May 2010 that the State try the case within nine months, and he would have ordered the State to do so sooner but for scheduling conflicts. Simply put, there is no suggestion that Judge Keesley conducted Langford's trial in anything but a fair and impartial fashion. We therefore find no evidence of actual prejudice in the record.

Undoubtedly, section 1-7-330 leaves room for abuses which can deny a defendant due process. Not only can the State theoretically pick a judge to preside because he will favor the prosecution, but the Public Defender Association's brief contains very troubling examples of abuses occurring in other cases and in other forms. Andrew M. Siegel, *When Prosecutors Control Criminal Court Dockets: Dispatches on History and Policy from a Land Time Forgot*, 32 Am. J. Crim. L. 325, 351-69 (2005) (detailing the potential ills of prosecutorial control of the docket). Perhaps this is why South Carolina until today has stood alone amongst our sister states in permitting the prosecutor to control the docket. *See id.* at 327 (noting that South Carolina is the only state with such a system). Of course, the vast majority of solicitors operate the criminal courts in a fair and even-handed manner, and the abuses cited generally are not associated with any nefarious intent. They do, however, inevitably stem from the nature of a system that allows the prosecution to control the criminal docket.

Nevertheless, we cannot equate the potential for abuse with it actually occurring in this case. Indeed, whether the statute may be unconstitutional in other circumstances has no bearing on whether it has been unconstitutionally applied in the case at hand. *See Simeon v. Hardin*, 451 S.E.2d 858, 871 (N.C. 1994) (holding prosecutorial control of the docket is facially constitutional and must be attacked on an as-applied basis). We must therefore determine whether Langford's rights were infringed based on the record before us. Under the lens of the only

A11

deprivation alleged to have occurred in this case, we find no evidence that Langford's due process rights were violated even if the State was able to select Judge Keesley to preside.

## B. Speedy Trial

Langford also contends the State's dilatory practices in calling his case deprived him of his right to a speedy trial.[7] The Sixth Amendment to the United States Constitution provides, in part, "In all criminal prosecutions, the accused shall enjoy the right to a speedy . . . trial." U.S. Const. amend. VI. Similarly, the South Carolina Constitution guarantees that "[a]ny person charged with an offense shall enjoy the right to a speedy . . . trial." S.C. Const. art. I, § 14. The main goals of this right are to prevent undue pretrial incarceration, minimize the anxiety stemming from public accusation of a crime, and limit the possibility of long delays impairing an accused's defense. *State v. Waites*, 270 S.C. 104, 107, 240 S.E.2d 651, 653 (1978).

The Supreme Court of the United States has deemed this right "generically different from any of the other rights enshrined in the Constitution for the protection of the accused." *Barker v. Wingo*, 407 U.S. 514, 519 (1972). This is due in large part to the reality that "[d]elay is not an uncommon defense tactic" and "deprivation of the right to a speedy trial does not per se prejudice the accused's ability to defend himself." *Id.* at 521. More important, however, is the vagueness of this right, which makes it nearly impossible to determine when it has been violated. *Id.* Indeed, the various procedural safeguards built into the criminal process require that it "move at a deliberate pace." *United States v. Ewell*, 383 U.S. 116, 120 (1966). Thus, "there is no fixed point . . . when the State can put the defendant to the choice of either exercising or waiving the right to a speedy trial." *Barker*, 407 U.S. at 521.

---

[7] We reject the State's argument that this issue is not preserved for review due to Langford's failure to renew his motion to dismiss when his case was called for trial. In its May 2010 order denying Langford's original motions, the court required the State to try the case within nine months. It then said Langford could renew his motion to dismiss at that time if the State failed to do so. Because nine months had not yet passed when the case was tried, it would have been futile for Langford to raise the issue again. *See State v. Pace*, 316 S.C. 71, 74, 447 S.E.2d 186, 187 (1994) (finding appellant did not waive an objection by not presenting it to circuit court because it would have been futile to do so).

Accordingly, "[t]he right to a speedy trial is necessarily relative. It is consistent with delays and depends upon circumstances." *Beavers v. Haubert*, 198 U.S. 77, 87 (1905). Stated differently, "[a] speedy trial does not mean an immediate one; it does not imply undue haste, for the [S]tate, too, is entitled to a reasonable time in which to prepare its case; it simply means a trial without unreasonable and unnecessary delay." *Wheeler v. State*, 247 S.C. 393, 400, 147 S.E.2d 627, 630 (1966). Because of the vagaries of this unavoidably ad hoc inquiry, the Supreme Court has acknowledged that it "can do little more than identify some of the factors" for courts to examine. *Barker*, 407 U.S. at 530. These factors include the length of the delay, the reason for it, the defendant's assertion of his right to a speedy trial, and any prejudice he suffered.[8] *Id.*; *see also Waites*, 270 S.C. at 107, 240 S.E.2d at 653 (recognizing the same factors apply under South Carolina law).

The Supreme Court has counseled further that none of these factors is "either a necessary or sufficient condition to the finding of a deprivation of the right of speedy trial." *Barker*, 407 U.S. at 533. Instead, they are all related and must be considered along "with such other circumstances as may be relevant." *Id.* Thus, the Supreme Court created a balancing test which is a rejection of "inflexible approaches" and weighs "the conduct of both the prosecution and the defense." *Id.* at 529-30. If a court concludes that this right has been violated, dismissal of the charges "is the only possible remedy." *Id.* at 522. A court's decision on whether to dismiss on speedy trial grounds is reviewed for an abuse of discretion. *See State v. Edwards*, 374 S.C. 543, 571, 649 S.E.2d 112, 126 (Ct. App. 2007) (applying abuse of discretion standard to speedy trial claim), *rev'd on other grounds*, 384 S.C. 504, 682 S.E.2d 820 (2009); *see also State v. Redding*, 561 S.E.2d 79, 80 (Ga. 2002) (noting the inquiry is whether court abused its discretion under *Barker*). "An abuse of discretion occurs when the trial court's decision is based upon an error of law or upon factual findings that are without evidentiary support." *Fields v. J. Haynes Waters Builders, Inc.*, 376 S.C. 545, 555, 658 S.E.2d 80, 85 (2008)

We begin our analysis with the "triggering mechanism" of a speedy trial claim, which is the length of the delay. *Barker*, 407 U.S. at 530. We should not even examine the remaining factors "[u]ntil there is some delay which is

---

[8] The circuit court did not cite to *Barker* or explicitly apply any of these factors. However, the court's analysis largely tracks the substance of the test, and no party has contended the court did not use the proper legal framework when ruling on Langford's motions.

A 13

presumptively prejudicial." *Id.* The clock starts running on a defendant's speedy trial right when he is "indicted, arrested, or otherwise officially accused," and therefore we are to include the time between arrest and indictment. *United States v. MacDonald*, 456 U.S. 1, 6 (1982). The Supreme Court was quick to remind in *Barker*, however, that even the length of time necessary to trigger the full inquiry "is necessarily dependent upon the peculiar circumstances of the case." 407 U.S. at 530-31. Thus, a simple prosecution for ordinary street crime may have a lower threshold for a presumptively prejudicial delay than a more complex conspiracy case. *Id.* at 531; *see also id.* at 531 n.31 (suggesting that a delay of nine months could have been presumptively prejudicial in a case that depended on eyewitness testimony (citing *United States v. Butler*, 426 F.2d 1275, 1277 (1st Cir. 1970))).

In the case before us, Langford's speedy trial clock began when he was arrested on October 3, 2008, and ran until he was tried twenty-three months later on September 7, 2010. Moreover, while the charges against him were serious, the factual proof was not complicated. Thus, this length of time is presumptively prejudicial and triggers the remaining *Barker* inquiry. *See Waites*, 270 S.C. at 108, 204 S.E.2d at 653 (holding a two-year-and-four-month delay in a prosecution for assault and battery of a high and aggravated nature and for pointing and presenting a firearm implicated the rest of the *Barker* analysis); *see also Doggett v. United States*, 505 U.S. 647, 652 n.1 (1992) ("Depending on the nature of the charges, the lower courts have generally found postaccusation delay 'presumptively prejudicial' at least as it approaches one year."); *Brooks v. State*, 674 S.E.2d 871, 873-74 (Ga. 2009) (finding a nineteen-month delay presumptively prejudicial in trial for murder, aggravated assault, and firearms offenses).

Turning to the second element, the Supreme Court has stated that "different weights should be assigned to different reasons" for the delay. *Barker*, 407 U.S. at 531. A deliberate attempt by the State to delay the trial as a means of impairing the accused's ability to defend himself "should be weighted heavily against the government." *Id.* Neutral reasons, which could include overcrowded dockets or negligence, are "weighted less heavily" but still count against the State because it bears the ultimate responsibility for these circumstances. *Id.; see also State v. Pittman*, 373 S.C. 527, 549, 647 S.E.2d 144, 155 (2007) ("The ultimate responsibility for the trial of a criminal defendant rests with the State."). Delays occasioned by the defendant, however, weigh against him. *Vermont v. Brillon*, 129 S. Ct. 1283, 1290 (2009). This is not only in accord with the reality that delay may be a defense tactic, but it is also a recognition that a defendant should not be able to procure a dismissal of the charges against him due to delays he caused. *See id.*

A 14

The State advances two different reasons for the delays in Langford's prosecution. First, it argues that the initial twenty-month delay in indicting him was due to its inability to have a "meaningful" conversation with the victims because it could not find an interpreter. Although we are not persuaded the State used its best efforts to secure an interpreter, there is no evidence that it intentionally tarried in finding one. At most, the State was negligent, and this is a neutral reason for delay which does not weigh heavily against it.

Next, the State contends the final four-month delay in trying Langford, running from May 2010 to September 2010, was the result of Langford coercing Phillips to not testify. From our review of the record, there is evidence that Langford and his co-defendant persuaded Phillips to remain silent. So long as he did so, he would be unavailable for cross-examination. Thus, the State would be unable to use Phillips' original statement as evidence against Langford. *See Bruton*, 391 U.S. at 126. The loss of this crucial piece of evidence therefore effectively gutted the State's case on the day of trial.

The State consequently needed to first procure a waiver of Phillips' right to remain silent, and then it could try Langford using the statement. Because Phillips' attorney was not ready to proceed during that term of court, however, a continuance was required for this to happen.[9] From that point on, the State moved with reasonable haste given the few General Sessions terms scheduled for Edgefield County during that time. We agree with the circuit court that the delays already incurred are troubling, but we cannot ignore the fact that this additional delay is the product of Langford's efforts to spoil the State's evidence. Therefore, we will not count it against the State. *See United States v. Loud Hawk*, 474 U.S. 302, 316 (1986) (holding a defendant who causes delays in his trial "should not be able upon return to the district court to reap the reward of dismissal for failure to receive a speedy trial").

---

[9] Langford's argument that the State simply could have redacted Phillips' references to him in the statement to avoid *Bruton* misses the point. Phillips was the key prosecution witness, and his testimony was essential to the State's case. Holding that the State was required to forego the use of Phillips' statement against Langford without consideration of why Phillips changed his mind would allow Langford to benefit from his tampering with the State's star witness.

A 15

The third factor in the *Barker* analysis is the defendant's assertion of his right to a speedy trial. While Langford first filed what seems to be a *pro se* speedy trial motion in June 2009, the record suggests that he never sought a ruling on it until the May 2010 hearing. Moreover, while Langford did file a *pro se* motion for a speedy trial/motion to dismiss days after the court issued its May 2010 order, it was never ruled upon and he never renewed his motion when the case was called for trial. Although it may have been futile for him to raise the issue again from an error preservation standpoint, the "failure to assert the right will make it difficult for a defendant to prove that he was denied a speedy trial." *See Barker*, 407 U.S. at 532.

Finally, we must consider the prejudice Langford suffered. The Supreme Court has identified three different types of prejudice the right to a speedy trial seeks to prevent: (1) oppressive pre-trial incarceration; (2) anxiety stemming from being publicly accused of a crime; and (3) the possibility that the accused's defense will be impaired due to the death or disappearance of witnesses or the loss of memory with the passage of time. *Id.* "Of these, the most serious is the last, because the inability of a defendant adequately to prepare his case skews the fairness of the entire system." *Id.*

Langford was in jail for nearly two years pending trial. "The time spent in jail awaiting trial has a detrimental impact on the individual" through its attendant job loss, disruption of family life, and encouragement of "idleness." *Id.* While we are cognizant of not minimizing the deleterious effects of lengthy pre-trial incarceration, the two-year delay in bringing this case to trial does not amount to a constitutional violation in the absence of any actual prejudice to Langford's case.[10] *See State v. Kennedy*, 339 S.C. 243, 250, 528 S.E.2d 700, 704 (Ct. App. 2000) ("While Kennedy may have been slightly prejudiced by the twenty-six month pretrial incarceration, the more important question is whether he was prejudiced because the delay impaired his defense."). To that end, Langford has not demonstrated how his own defense was prejudiced by the delay. Although he does argue the final delay enabled the State to secure Phillips' testimony and thereby bolster its case against him, he fails to recognize that the State only had to do so

---

[10] While extreme delays may warrant relief based solely on pre-trial incarceration, this case has not crossed that threshold. *See Doggett*, 505 U.S. at 657 ("[T]o warrant granting relief, negligence unaccompanied by particularized trial prejudice must have lasted longer than negligence demonstrably causing such prejudice.").

A16

because of his interference. Moreover, he cannot point to any evidence of anxiety caused by the stigma of being accused of these crimes.

Looking at these factors and the case as a whole, and taking into account the balance of the State's interests and Langford's, we do not believe the circuit court abused its discretion in finding Langford was not denied a speedy trial in the constitutional sense.

## CONCLUSION

For the foregoing reasons, we hold section 1-7-330 is unconstitutional under the separation of powers clause of our constitution. The General Sessions docket will henceforth be managed pursuant to the administrative order issued in conjunction with this opinion. Nevertheless, we affirm Langford's convictions because he has not shown he was prejudiced by the solicitor's control over calling his case for trial. In particular, we find no due process violation or a denial of his right to a speedy trial.

**TOAL, C.J., BEATTY and KITTREDGE, JJ., concur. PLEICONES, J., dissenting in a separate opinion.**

A 17

**JUSTICE PLEICONES:** I respectfully dissent from that part of the opinion that finds S.C. Code Ann. § 1-7-330 (2005) unconstitutional.

As explained below, the constitutionality of the statute is not before us. It is axiomatic that this Court will not address a constitutional issue unless it is necessary to a resolution of the case. *E.g., S.C. Dep't of Soc. Servs. v. Cochran,* 356 S.C. 413, 589 S.E.2d 753 (2003). It is also axiomatic that we sit to review the lower court's order based upon the issues properly presented by the parties for our consideration. *E.g., Herron v. Century BMW,* 395 S.C. 461, 719 S.E.2d 640 (2011). Constitutional issues are not exempt from issue preservation requirements. *Id.* Further, our rule restricts amicus to the issues presented by the parties, Rule 213, SCACR: to strike down a statute as unconstitutional based upon an amicus brief is tantamount to a *sua sponte* declaration. Unless a statute infringes upon our jurisdiction, we may not *sua sponte* declare it unconstitutional. *See State v. Keenan,* 278 S.C. 361, 296 S.E.2d 676 (1982). We should not decide the constitutionality of § 1-7-330 on this record.

Even if the constitutionality of § 1-7-330 were before us, under our existing precedents I find that the statute does not offend the separation of powers doctrine. I agree that solicitors are executive officers. S.C. Code Ann. § 1-1-110 (2005). Further, I agree that § 1-7-330 vests the exclusive authority to prepare the general sessions docket in the solicitor, and also authorizes her to determine the order in which the docketed cases are called. Finally, I do not disagree with the majority that by vesting exclusive authority in the solicitor to prepare the general sessions docket, and by permitting the solicitor to call cases from that docket in his desired order, § 1-7-330 could lead to unnecessary delay, oppressive haste, and other abuses. As I interpret the statute, however, I do not believe that it violates the South Carolina Constitution.

We have recently addressed a separation of powers challenge to prosecutorial authority:

> Under the separation of powers doctrine, which is the basis for our form of government, the Executive Branch is vested with the power to decide when and how to prosecute a case. Both the South Carolina Constitution [footnote 5 citing S.C. Const. art. V, § 24] and South Carolina case law [footnote 6 citing *McLeod v. Snipes,* 266 S.C. 415, 223 S.E.2d 853 (1976)] place

A 18

the unfettered discretion to prosecute solely in the prosecutor's hands. The Attorney General as the State's chief prosecutor may decide when and where to present an indictment, and may even decide whether an indictment should be sought. Prosecutors may pursue a case to trial, or they may plea bargain it down to a lesser offense, or they can simply decide not to prosecute the offense in its entirety. The Judicial Branch is not empowered to infringe on the exercise of this prosecutorial discretion . . . .

*State v. Thrift*, 312 S.C. 282, 291-292, 440 S.E.2d 341, 346-347 (1994) cited with approval in *State v. Needs*, 333 S.C. 134, 146, 508 S.E.2d 857, 863 (1998); *State v. Burdette*, 335 S.C. 34, 40, 515 S.E.2d 525, 528 (1999).

Further, "[a]ll the authorities agree that, in the exercise of a discretionary official act, an executive officer cannot be restrained, coerced, or controlled by the judicial department." *State v. Ansel*, 76 S.C. 395, 57 S.E. 185 (1907).

Subject to the limitations discussed below, the solicitor has the discretion to decide when to prosecute and how to prosecute a case. This does not mean that the solicitor's authority is unrestrained by judicial oversight. The trial judge has the ultimate authority to determine whether a case called by the solicitor will be tried at a particular juncture. *See State v. Mikell*, 257 S.C. 315, 185 S.E.2d 814 (1971) ("In the calling of cases for trial the solicitor has a broad discretion in the first instance, and the trail [sic] judge has a broad discretion in the final analysis."). This is so because the trial judge has "the inherent power to control the order of [the court's] business to safeguard the rights of litigants" through her discretion to grant a continuance. *Williams v. Bordon's Inc.*, 274 S.C. 275, 262 S.E.2d 881 (1980). In *Williams*, the Court held the General Assembly violated the separation of powers doctrine by enacting a statute which purported to limit the court's discretion to grant a continuance in any case which involved an attorney-legislator as "attorney of record, witness, or otherwise." If we read § 1-7-330 as preventing a trial judge from exercising her discretion to require a solicitor to place a case upon a future docket if necessary to safeguard the rights of the defendant, then we would render the statute unconstitutional. Such an interpretation would create a separation of powers issue, not between the executive and the judiciary, but between the legislative branch and the judicial branch since we would find the

A19

statute unconstitutionally infringes upon judicial authority. *Williams, supra.* Nothing in § 1-7-330 affects the court's inherent authority to safeguard litigants' rights; rather, the statute represents the reasonable delegation of preparing the general sessions docket to the solicitor.

The solicitor is a party to every general sessions proceeding, and has the information and resources necessary to determine when a case is ready to be called. If the solicitor is perceived to be unlawfully delaying the call of a case, the defendant has available the remedy of a speedy trial motion: If it is called with undue haste, the defendant may seek a continuance. It is only logical to have the solicitor initially set the docket since he knows the status of the law enforcement investigation, of the examination of the forensic evidence, of any codefendant's case, and of the defendant's other charges. *See State v. Mikell, supra* ("A prosecuting attorney normally has many cases for disposition. He must plan ahead to expedite the work of the court . . . ."). The solicitor bears the burden of proof in every case and should not ordinarily be compelled to call his case before he is ready. *Id.*("solicitor has authority to call cases in such order and in such manner as will facilitate the efficient administration of his official duties, **subject to the broad discretion of the trial judge.**")(emphasis supplied). In my opinion, there is no separation of powers problem with § 1-7-330. *E.g., State v. Thrift, supra.*

Finally, I disagree with the premise of the majority's opinion, "that section 1-7-330 is at odds with [the courts'] intrinsically judicial power." Even if one were to grant that the statute creates some overlap of executive and judicial authority, it cannot be said that preparing a docket and calling cases from that docket usurps the judicial power vested in the unified judicial system under S.C. Const. art. V, §1 (1977). *See Carolina Glass Co. v. Murray*, 87 S.C. 270, 291-292, 69 S.E. 391, 399 (1910) *overruled in part on other grounds McCall v. Batson*, 285 S.C. 243, 329 S.E.2d 741 (1985).

In my opinion, however, we cannot reach the constitutionality of that statute in this case. Were we to reach the issue, I would interpret the statute in a way that does not offend the separation of powers doctrine. If the Court is nonetheless determined to declare § 1-7-330 unconstitutional, then we must both deal with our precedents and describe the new system in sufficient detail that the parties most intimately involved in the process can implement the necessary changes.

I concur in the majority's decision to affirm this appeal and in the sentiment that our General Sessions docketing system needs reform, but dissent from so much of that opinion as reaches and decides the constitutionality of § 1-7-330.

A 20

# The Supreme Court of South Carolina

**RE:  DISPOSITION OF CASES IN GENERAL SESSIONS**

---

ORDER

---

Pursuant to the provisions of S.C. CONST. Art. V §4, and in furtherance of this Court's decision in *State v. Langford,*

IT IS ORDERED that:

Cases in General Sessions Court shall proceed as follows:

(A)  All cases shall be assigned to a 180 day track consistent with the Uniform Differentiated Case Management Order which is incorporated herein and made a part hereof by reference.  The Chief Judge for Administrative Purposes (CJAP) may entertain motions to remove any case from the track and establish a scheduling order where appropriate.

(B)  Cases within the 180 day track or cases that have exceeded the 180 day track by less than one (1) year, shall remain under the control of the Solicitor, subject to the provisions set forth below:

(1)  General Docket.  The General Docket consists of all pending General Sessions matters. Absent the grant of a speedy trial motion, the Solicitor shall have the initial responsibility for designating when a case is ready for trial.  Upon determining that a case is ready for trial, the Solicitor shall file with the Clerk of Court a "NOTICE OF COURT DOCKETING" on a form prescribed by the Supreme Court and shall serve all parties and counsel of record.  Upon receiving such notice, the Clerk shall place the case on the Court Docket and the matter may be called for trial any time after thirty (30) days from the filing of the NOTICE OF COURT DOCKETING. The Court Docket consists of all matters that the Solicitor has deemed ready for trial.  Once

A 21

the case is placed on the Court Docket, the Court assumes the responsibility for setting a trial date and the Clerk, under the direction and supervision of the CJAP, shall publish a trial roster from the Court Docket of cases subject for trial at least twenty-one (21) days before each term of court. Publication shall be effected once the Clerk makes the trial roster available in the Clerk's office or on the Clerk's internet site. The Clerk shall also distribute the trial roster to those attorneys listed upon it by Fax, US Mail, hand delivery, or electronic delivery. Cases on the trial roster not reached for trial will be subject to being called for the next two terms of court before being republished. It is the responsibility of each defense attorney to notify the defendant that the case is scheduled for trial and to remind the defendant of the right and obligation to be present at trial. Motions for continuance or other relief from a published trial roster shall be made in accordance with Rule 7, SCRCrimP. The CJAP or presiding judge shall rule on the motion.

(2)     Nothing herein shall affect the Court's ability to schedule motions or other pretrial proceedings as may be appropriate, or the right of the CJAP to add cases to any trial roster or designate cases for a day certain as the CJAP deems appropriate, subject to the notification requirements set forth in paragraph B(1), above.

(C)   Cases more than one year beyond their 180 day track will be automatically transferred to the CJAP's supervision as follows:

(1)     Judicial Docket. If the Solicitor has not filed a NOTICE OF COURT DOCKETING in accordance with Paragraph (B) (1) above for any case more than one (1) year beyond its assigned track, it will be automatically transferred to the Judicial Docket, which the Clerk shall maintain separate and apart from the regular Court Docket. The CJAP will administer and supervise the Judicial Docket. The Solicitor must notify the Clerk within fifteen (15) days after expiration of this period of time of all cases that are in this category and furnish the following information: (1) Indictment number; (2) Defendant's name; (3) Date of Arrest; (4) Assigned Assistant Solicitor; (5) Defense Counsel; (6) Date of Indictment (True Bill); (7) Track

A-22

expiration date; (8) Prior request(s) for continuance.  The Clerk will maintain the Judicial Docket which will include this information.

(2)    Upon placement on the Judicial Docket, the CJAP shall arrange for the scheduling of trial or other disposition of the case. Additionally, the CJAP may upon the request of any party transfer the case to the trial roster in accordance with Paragraphs (B) (1) and (2).

(3)    If the case has not been disposed of more than one (1) year following its transfer to the Judicial Docket, the CJAP will dismiss the case, absent the Solicitor establishing good cause. Both the Solicitor and the defendant shall be notified of the pending dismissal and be given an opportunity to be heard. Cases dismissed pursuant to this provision will be without prejudice, unless otherwise specified by the CJAP. The Solicitor will notify the victim(s) of cases dismissed pursuant to this provision.

(D)    Non-Track Cases:

The Solicitor shall furnish to the CJAP a quarterly status report of all non-track cases. The report shall contain information regarding the progress of the case and the expected disposition date.

(E)    Old Case Disposition:

Any case, including non-track cases, pending four (4) or more years from the date of indictment by the Grand Jury shall be dismissed by the CJAP, unless the Solicitor shall show good cause why it should not be dismissed.  Such dismissal is without prejudice, unless otherwise specified by the CJAP and the Solicitor shall have the right to re-present the matter to the Grand Jury.  Before ordering dismissal, the Clerk of Court shall notify the Solicitor and the defendant of the Court's intention to dismiss the case.  The Solicitor shall: (1) within ten (10) days of receiving the notice from the Court, notify the victim(s) in writing of the Court's intended disposition and invite the victim(s) to file a written response with the Solicitor within ten (10) days; and (2) within thirty (30) days file a written response with the Court setting forth in detail the reasons, including the response(s) of the victim(s), why the case should

A23

not be dismissed and advising the court of the expected time of disposition. The defendant may submit a written response within thirty days of the Solicitor's filing. The CJAP may schedule a hearing, dismiss the case without a hearing, or take such further action as may be appropriate. Failure to respond as set forth herein will result in the matter being dismissed pursuant to this provision. If the Solicitor shows good cause, the case shall automatically be transferred to the Judicial Docket.

This order shall be effective February 4, 2013.

s/ Jean H. Toal _____ C.J.

s/ Donald W. Beatty _____ J.

s/ John W. Kittredge _____ J.

s/ Kaye G. Hearn _____ J.


Because I dissent from the opinion,
I respectfully do not join in this order.


s/ Costa M. Pleicones _____ J.


November 21, 2012

Columbia, South Carolina

A 24

THE STATE OF SOUTH CAROLINA

IN THE SUPREME COURT

THE STATE,

RESPONDENT,

v.

K.C. LANGFORD,

PETITIONER

Appellate Case No. 2010-173128

Appeal from Edgefield County

William P. Keesley, Circuit Court Judge

Opinion No. 27195

PETITION FOR REHEARING

Petitioner, K.C. Langford, hereby petitions this Court, pursuant to Rule 221(a), SCACR, to rehear his claim that his right to a speedy trial was violated by the Solicitor's failure to call his case to trial in a timely manner. Petitioner asserts that this Court committed an error of law in its published opinion, *State v. Langford*, Opinion No. 27195 (filed November 21, 2012), by requiring Langford to show that the state's delay in calling his case actually prejudiced his defense. This rule—that a defendant must show actual prejudice to his defense to obtain relief— is found elsewhere in South Carolina's speedy trial jurisprudence, and it is contrary to established United States Supreme Court law.

A25

In *Barker v. Wingo* 407 U.S. 514 (1972), the United States Supreme Court laid out the analytical framework for assessing speedy trial claims, and identified four factors, including length of the delay, the reason for the delay, the defendant's assertion of his right, and prejudice to the defendant. *Id.* at 530. The fourth factor, prejudice, is to be assessed in light of the interests of defendants which the speedy trial was designed to protect: (1) to prevent oppressive pretrial incarceration; (2) to minimize anxiety and concern of the accused; and (3) to limit the possibility that the defense will be impaired. *Id.* at 532. The Court has consistently held, in *Barker* as well as *Doggett* and *Loud Hawk*, that deprivation of liberty is the core concern of this factor:

> Because the Court broadly assays the factors going into constitutional judgments under the speedy trial provision, it is appropriate to emphasize that one of the major purposes of the provision is to guard against inordinate delay between public charge and trial, which, wholly aside from possible prejudice to a defense on the merits, may 'seriously interfere with the defendant's liberty, whether he is free on bail or not, and that may disrupt his employment, drain his financial resources, curtail his associations, subject him to public obloquy, and create anxiety in him, his family and his friends.'

*Id* at 537 (quoting *United States v. Marion*, 404 U.S. 307, 320 (1971)).

Langford was prejudiced by the delay between his arrest and trial dates. As the United States Supreme Court has observed, unreasonable delay threatens to produce more than one sort of harm, including "oppressive pretrial incarceration," "anxiety and concern of the accused," and "the possibility that the [accused's] defense will be impaired" by the loss of memories and exculpatory evidence. *Doggett v. United States*, 505 U.S. 647 (1992) (quoting *Barker v. Wingo*, 407 U.S. 514 (1972). Langford was prejudiced because he was incarcerated for 28 months

A26

2

before he was brought to trial. *United States v. Loud Hawk*, 474 U.S. 302, 312 (1986) ("[T]he Speedy Trial Clause's *core concern* is impairment of liberty.") (emphasis added).

     As Langford details in his brief, he first asserted his right to a speedy trial 260 days after he was arrested. The state chose to wait 546 days to indict him, and 561 before it even attempted to try his case. Langford's right to a speedy trial was violated. *All* of this time was to attributable to the state because Langford did not take any action to delay his case, and had already asserted his right to a speedy trial. The Court, in its opinion, states that while Langford first filed his *pro se* speedy trial motion in 2009, "the record reflects that he never sought a ruling on it until the May 2010 hearing." But of course, Langford could not seek a ruling on it since, until the publication of this opinion, the solicitors in South Carolina controlled the docket system. Controlling the docket system, the solicitor in this case called the case to trial when *he wanted to do so*. At the time he asserted his first pro se speedy trial motion—approximately 9 months after he was arrested—the state had not even indicted his case.

     The Court, too, faults Langford for filing his second speedy trial motion after the May 2010 continuance, but failing to raise the issue at the time of trial. Even though the Court acknowledges "it may have been futile for him to raise the issue again from an error preservation standpoint," his failure to do so "will make it difficult . . . to prove that he was denied a speedy trial." In other words, this Court faults Langford for not undertaking a gesture it recognizes would have been "futile." The Court here disregards the fact that Langford attempted to have his case tried the only way he could-- by filing a motion with the Clerk of Court. It is not his fault that neither the court system nor the solicitor paid him any regard.

     The Court also erred when it found that the final four month delay was the result of Langford coercing a co-defendant not to testify, thereby making this delay attributable to

A27

Langford. First of all, by the time this even became an issue, the state had waited 561 days from the time of Langford's arrest to this first trial date. Just as importantly, though, the state only found out about the witness problem on this date. In other words, had this been a judicially set trial date—and not a date set at the mere whim of the solicitor—the state would have (one assumes) evaluated the strength of its case before it called the case to trial. Thus, the Court's reliance on this fact is tantamount to holding Langford accountable for the state's failure to properly prepare its own case even after 561 days.

The Court claims that in its review of the record, there is "evidence that Langford and his co-defendant persuaded Phillips to remain silent." It is notable, however, that Judge Keesley's order makes no such finding. Additionally, the Court finds that requiring the state to forgo the use of Phillips' statement against Langford without consideration of why Phillips changed his mind would allow Langford to benefit from his tampering with the State's star witness. This misses the point—*that the state did not know the strength of its case when it called it to trial* because it knew there would be no repercussions to continuing this case as often as it wanted, or needed, to do so. As the Court notes, Alvin Phillips was the key witness for the state. Knowing that its case rested almost entirely on one sole witness, the state allowed, in spite of this fact, the case to languish for nearly two years.

The substantial error that this Court commits is that, while it cites both *Barker v. Wingo* and *Doggett v. United States* in its prejudice analysis, it fails to actually apply the principles articulated in those cases and, instead, focuses wholly on the demonstrable prejudice to Langford's defense. *Cf. Doggett* (defendant granted relief even though he was released on bond and the Court found that Doggett "did indeed come up short" with respect to showing that the

A2f